THE STATE ex inf. ELLIOTT W. MAJOR, Attorney-General, v. INTERNATIONAL HARVESTER COMPANY OF AMERICA.

In Banc, November 27, 1911.

1. COMBINATION IN RESTRAINT OF TRADE: Eliminating Destructive Competition: Benefit to Consumer: Legislative Rule.
A combination, organized for the purpose of acquiring the properties and assets of a half dozen large companies engaged in a fierce and demoralizing competition and doing in this country from eighty to ninety per cent of the business in which they were engaged, cannot be held not to be one declared unlawful by the statute, simply because its first results were to restore an equable condition to the market and to remove that destructive competition. The law is not interested alone in the consumer. A competition between producers may become so fierce and destructive as to be of no ultimate advantage to the consumer; yet the tendency of a fair competition is to produce a wholesome condition of the market. The law also has regard for the producer; competition may be of such a character and so designed as to destroy weaker competitors, leaving only a giant in the field, who then would have a monopoly of the market; the law will protect a small manufacturer or dealer from the destruction that the avarice of a powerful rival might design. It is impossible for the Legislature to prescribe a general rule by which competition conducive to a wholesome condition of the market can be distinguished from a combination that is demoralizing and disorganizing.

237 Sup.—24

2. ———: Reasonable Restraint: Unused Power or Moderate Use.
When a contract or act of combination is to be upheld on the
theory that it is only a reasonable restriction on trade, it must
appear on the face of the contract or act that the restriction which
it creates is limited within reasonable bounds. It will not avail
one who attempts to defend a contract unlimited in its terms,
or an act unlimited in the apparent scope of its power, to say
that it will be used only in a moderate degree. The law is jealous
of unlimited power in whosesoever hands placed. When men
deliberately and intelligently acquire power that will enable them
to control the market of a useful article, it is no defense for them
to say they did not control the trade or limit competition in that
article, and have not used their power oppressively. The statute
is designed to prevent the acquisition of power for the purpose
of influencing the market by combinations of concerns that other-
wise would compete with each other in the market. The purpose
of those entering the combination is to be ascertained from the
consequences that naturally will result from their acts. The fact
that the acquired power has not been used to the injury of the
consumer or other dealers is no defense.

3. ———: ———: Combining Competing Companies. The buying
of the entire assets of five or six great companies engaged in the
manufacture and sale of farming machinery and combining them
into one corporation, with the design that the fierce and destruc-
tive competition that had existed between them might cease, and
with the result that it did cease, is in violation of the anti-trust
statutes, and the corporation has no right to do business in this
State.

4. ———: ———: ———: Brought About by Separate Contracts.
The fact that there was no joint agreement between the competing
companies to merge themselves into one or to sell their entire
assets to another, does not affect the fact that the purchaser com-
bined their properties for the purpose of eliminating competition
between them; nor does the fact that each conducted its part of
the scheme as if it were simply making a separate sale of its own
properties. Those things show they were acting cautiously, and
were endeavoring to avoid the appearance of a combination,
and to circumvent the anti-trust laws; but if the effect was to
remove them all from trade as active competitors and to combine
all their business in the one purchaser, the form of contract by
which the combination was brought about cannot save it from
condemnation.

5. ———: Corporations: Doing Business in State: Principal and
Agent. What a principal is forbidden to do in his own name he
cannot do through an agent. Where a corporation of New Jersey
cannot do business in Missouri, since it is a combination in re-
straint of trade, in violation of the anti-trust statutes, it cannot

State ex inf. v. International Harvester Co.

do business in this State through a Wisconsin corporation, previously licensed to do business here, whose stock and assets it has acquired. If the unlawful principal cannot legally obtain a license to do business here neither can its agent, nor will a license previously issued to its agent avail.

6. ———: ———: ———: ———: **Amount of Capital Invested Here.** A corporation cannot do business in this State through a sales agent whose capital stock is less than a hundredth part of its own capital. A New Jersey corporation, capitalized for $120,-000,000 and engaged in the manufacture of harvesters, even if it were not to be otherwise excluded, cannot be permitted to do business here through a sales agent, a Wisconsin corporation, whose properties it has bought and whose capital represented in this State at the time it was licensed to do business here was only $750,000.

7. ———: **Penalty.** In determining the penalty to be adjudged in the case of a corporation shown to be an unlawful combination in restraint of trade, the court should have regard to the consequences to follow its decision. If it would be an injury to the people of the State to forbid the foreign corporation to do business here, the court may pronounce a judgment of ouster, and suspend the judgment on terms that will be fair to the company and conducive to the welfare of the people. And in considering the welfare of the people the evil of enhancing the prices of its manufactures to the injury of the people is not the only evil to be guarded against; the driving of small competitors out of business is a wrong that must be held in view.

8. ———: **Facts Showing Arrangement and Purpose Thereof: Penalty.** Six corporations manufacturing mowers, binders and reapers were engaged in fierce competition in the sale of their machines. They were doing business everywhere and from eighty to ninety per cent of the harvester business of the country, the balance being done by smaller concerns in picked places where conditions were more favorable and competition less active. The owner of one of them applied to Perkins of New York for a loan of money, and stated the condition of the business generally. Perkins bought the entire properties of another, a Wisconsin corporation, and then he and the owners of the other five met around a table in New York and conveyed all the assets, patents, trade-marks, machines and other tangible properties of each company, by separate contracts, to a trustee, for a named sum; then the International Harvester Company (a New Jersey corporation) was organized with a capital of $120,000,000, and these properties were conveyed to it by the trustee, its stock being issued to voting trustees, each trustee holding stock therein in proportion to the valuation of the separate properties of the separate six companies as fixed by their separate contracts, this

stock and this arrangement being accepted by the former owners of the separate companies in payment for their properties. Because some of the states would not admit within their borders a corporation of such large capital stock, and others imposed a larger license tax than the mergers thought was reasonable, it was decided that the International Harvester Company would limit its operations to manufacturing the machines, and, to sell them, would employ another company which would not be objectionable to the laws of those states. For this purpose the managers of the International Harvester Company turned their attention to the Wisconsin corporation, whose stock and properties it then owned, and which had already been licensed to do business in this State, and is the only respondent, and whose name they changed to the International Harvester Company of America, and whose directors they elected. This company, having charge of the entire business of selling the machines manufactured by the other, appointed sales agents in each state, one for the "McCormick" machines, one for the "Deering," one for the "Champion," etc., and compelled each agent to take the machines at a price named by the company, and to sell them at a price named by it, and for a named commission, and if there was any reduction from the listed price to the retailer or consumer the reduction was to and did come out of the agent's commission, and each agent confined himself to selling the machines mentioned in his contract, and could sell those of no other manufacture. After four years of the nine since this arrangement was effected, the provision that the agent was to sell the machines at a price named by respondent was omitted from the agents' contracts. Immediately after the consolidation was effected, competition in the trade ceased. The first year thereafter, prices of machines to consumers was lowered. Thereafter there was a small increase in prices, but that increase was not equal to the increase in cost of production.

*Held*, by all the judges, that the arrangement was an unlawful combination in restraint of trade, and was made for the purpose of lessening full and free competition, and the respondent being a party to the arrangement should be ousted from doing business in this State until it severs itself as a member of the combination.

*Held*, by VALLIANT, C. J., that the International Harvester Company should be permitted to obtain a license to do business in this State upon the payment of the license tax prescribed by law, and upon condition that it do not use its power either to force a competitor to sell or to drive it out of the market by unfair methods, and that it will not raise the prices of the machines it sells beyond a fair profit on their cost and the expense of marketing them, the license to stand revoked if at any time hereafter, on motion of the Attorney-General, it be made to appear that said company has violated any of said conditions.

State ex inf. v. International Harvester Co.

*Held*, by GRAVES, J., that the judgment should not be made to apply to the International Harvester Company, since it is not a party, but only to the International Harvester Company of America, which is the only respondent; and that respondent should be fined $50,000, and ousted from the State, the ouster to be conditioned upon its severance within a time prescribed by the court of all unlawful connection with the International Harvester Company.

*Held*, by FERRISS, J., that no fine should be imposed, but that respondent should be ousted, the ouster to be suspended upon condition that respondent show within a specified time that it is no longer a member of the combination.

Upon rehearing, the fine of $50,000 is reduced to $25,000 and the judgment of ouster, upon condition, affirmed.

9. ———: ———: Judgment: Against Company Not Party. The court should not by its judgment place restrictions upon a company not before the court. If such a company desires to do business in this State it should have the right to make application for a license unhampered by a prejudgment in a case to which it was not a party. But in determining whether or not a company that is a party is an unlawful combination in restraint of trade, and the punishment to be assessed, the court should consider the relation such other company bore to it, and the character of business done by each. [Per GRAVES, J.]

10. ———: Statute: To What Applies. The statute (Sec. 10301, R. S. 1909) prohibits two classes of "arrangements, contracts, agreements, combinations and understandings"; namely, (1) those that were made "with the view to lessen : . . full and free competition," but which may not have been so operated as to accomplish the result intended; and (2) those "which tend to lessen . . . free and full competition" and which in fact do or did lessen competition. Judged by this evident meaning of the statute, the International Harvester Company of America from its inception was a corporation that falls within both classes. To bring the arrangement within the prohibition of the statute it is not necessary that competition actually stopped; if it was made with the view of lessening competition it is unlawful. [Per GRAVES, J.]

11. ———: ———: At Date of Arrangement: Continuing. If a new corporation with the "design and view of lessening full and free competition" bought up all the properties and assets of several other competing corporations and engaged in the manufacture of the same and like machines, and respondent, organized as a sales agent for the sale of the machines made by said company, was a party to said arrangement, it was then and now is guilty of violating the anti-trust statutes. If the arrangement was unlawful when made, it remains unlawful so long as it exists. [Per GRAVES, J.]

12. ————: **Construction Combiners Placed Upon Own Acts.** Not only the meaning of a contract, but the purpose of an act, may be judged by the construction the parties thereto place upon it. The purpose of one act can be gathered by subsequent acts immediately following, where the subsequent acts were done in pursuit of a performance of the first. [Per GRAVES, J.]

13. ————: **Penalty: Defrauding State of Taxes: Fine.** As the respondent has openly violated the laws whilst domiciled in this State, by entering into an arrangement to thwart competition; has defrauded the State of license taxes to which it was entitled, by acting as a sales agent on a capital of one-fortieth of that of its principal and by paying only one-fortieth of what its principal would have had to pay had it done business in its own name; has participated in lowering prices and driving other competitors from the field; has for nine years maintained an unlawful arrangement to decrease competition in this State, contrary to its laws; and has by its conduct been enabled to filch the purses of the agriculturalists, a fine of $50,000 and a conditional ouster are a reasonable and conservative punishment. [Per GRAVES, J.]

14. ————: **Of Public Benefit: Nevertheless an Illegal Combination.** Although the facts show that the combination has so far been beneficial to the community; that the price of its machines has not been raised in proportion to the increased cost of production, and other incidental benefits have accrued to the consumers; and that independent manufacturers have not been injured by reason of the combination; yet as the combination, as shown by the facts in evidence, was created to prevent the competition which up to that time had existed among the various companies that were merged into the combination, it must be held to be unlawful and in violation of the statute which forbids a license to do business in this State to any foreign corporation organized to lessen competition, and must be ousted. [Per FERRISS, J.]

15. ————: ————: **Penalty: Fine.** But in such case the corporation should not be fined, because such penalty is not required by the statute; but the judgment of ouster should go, and the company be prohibited from doing business in this State so long as it remains a member of such combination. [Per FERRISS, J.]


Quo Warranto.


WRIT OF OUSTER AWARDED (*and suspended conditionally*).

*Elliott W. Major*, Attorney-General.

*Charles G. Revelle* and *James T. Blair*, Assistant Attorneys-General, for informant.

(1) The commissioner, who heard the testimony and had the witnesses before him, reports that from the evidence adduced the International Harvester Company was organized for the express purpose of suppressing competition, and that respondent has been, and is, maintained by the International Harvester Company solely in furtherance of that unlawful purpose. Unless the findings of a commissioner appointed by the court to report on the law and facts are affirmatively and clearly shown to be wrong, the court will accept same as correct. State ex rel. v. Continental Tobacco Co., 177 Mo. 38; State ex rel. v. Standard Oil Co., 194 Mo. 164-5. (2) The organization of the International Harvester Company was brought about to restrain competition and was illegal. Secs. 10298, 10299, 10300, 10304, 10322, R. S. 1909; Harding v. American Glucose Co., 182 Ill. 551; Richardson v. Buhl, 77 Mich. 632; Distillery & Cattle Feed Co. v. People, 156 Ill. 448; State v. Nebraska Distilling Co., 29 Neb. 719; National Land Co. v. Grote Paint Store Co., 80 Mo. App. 266; Eustis v. Edgar, 207 Mo. 289; Finck v. Granite Co., 187 Mo. 244; United States v. American Tobacco Co., 164 Fed. 700; American Biscuit Co. v. Klotz, 44 Fed. 721; Strait v. National Harrow Co., 18 N. Y. Supp. 224; National Harrow Co. v. Hench, 76 Fed. 667; National Harrow Co. v. Hench, 83 Fed. 36; Continental Securities Co. v. Interborough Rapid Transit Co., 166 Fed. 945; Attorney-General v. A. Booth & Co., 143 Mich. 89; Merz Capsule Co. v. U. S. Capsule Co., 67 Fed. 414; Continental Wall Paper Co. v. Lewis Voight, Sons & Co., 148 Fed. 939; National Cotton Oil Co. v. Texas, 197 U. S. 129; Clancey v. Onondago Fine Salt Mfg. Co., 62 Barb. 395; United States v. Addyston Pipe & Steel Co., 85 Fed. 279; Pitts-

burg Co. v. McMillin, 119 N. Y. 46; Noyes on Corporate Relations (2 Ed.), secs. 307, 310; Beach on Monopolies and Industrial Trusts, sec. 159, pp. 505, 507, pr. 167, p. 543; pr. 165, p. 536; Eddy on Trusts and Monopolies, p. 550; pr. 617, 620, 621, 622; State ex rel. v. Standard Oil Co., 49 Oh. St. 137; People v. North River Sugar Refining Co., 54 Hun, 356; People v. North River Sugar Refining Co., 121 N. Y. 582; Bishop v. American Preserves Co., 157 Ill. 284; Dunbar v. Am. Tel. & Telegraph Co., 224 Ill. 9; Northern Securities Co. v. United States, 193 U. S. 197; United States v. Standard Oil Co., 173 Fed. 177; State ex rel. v. Standard Oil Co., 218 Mo. 1; 2 Cook on Corp. (6 Ed.), pr. 503a; State ex rel. v. Ins. Co., 152 Mo. 1; Railroad Co. v. Closser, 126 Ind. 348; State ex rel. v. Armour Packing Co., 173 Mo. 356; Froelich v. Musicians Mutual Benefit Assn., 93 Mo. App. 383; Heim Brewing Co. v. Belinder, 97 Mo. App. 64; State v. Duluth Board of Trade, 107 Minn. 506; State ex rel. v. National Harvester Co. (Kansas case not yet officially reported); Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Joint Traffic Assn. v. United States, 171 U. S. 338; Clark v. Central Railroad, 50 Fed. 346; International Harvester Co. v. Commonwealth, 99 S. W. 637; International Harvester Co. v. State, 99 Pac. 603; Cohen v. Berlin & Jones Envelope Co., 166 N. Y. 298; Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio 434; Railroad v. Railroad, 41 La. Ann. 970; United States v. Trans-Missouri Freight Assn., 166 U. S. 290. (3) The effect of this combination has been not only to restrain competition, but to create a monopoly. United States v. American Tobacco Co., 164 Fed. 700; United States v. Standard Oil Co., 173 Fed. 177; People v. Chicago Gas Trust Co., 130 Ill. 268; Con. Securities Co. v. Transit Co., 165 Fed. 945; Continental Wall Paper Co. v. Lewis Voight, Sons & Co., 148 Fed. 939; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Strait v. National Harrow Co., 18 N. Y. Supp.

224; American Biscuit Co. v. Klotz, 44 Fed. 721; National Lead Co. v. Grote Paint Store Co., 80 Mo. App. 266; Richardson v. Buhl, 77 Mich. 632; Froelich v. Musicians Mut. Benefit Assn., 93 Mo. App. 383; State ex rel. v. Standard Oil Co., 49 O. St. 137. (4) Respondent has been, and is, maintained by the International Harvester Company solely for the purpose of selling its products and in furtherance of the unlawful purpose for which it was organized and is violating the anti-trust laws of Missouri. Cases cited under Point 2, supra. (5) Respondent's license should also be revoked upon the additional ground that it has ceased to perform the functions for which it was licensed, and has permitted itself to be used in evasion of the Missouri law which precluded the International Harvester Company from doing business in this State. Secs. 3040, 3343, 3347, R. S. 1909; State ex rel. v. Delmar Jockey Club, 200 Mo. 32; Terrett v. Taylor, 9 Cranch, 51; Commonwealth v. Bank, 28 Pa. St. 389; People v. North River Sugar Refining Co., 54 Hun, 354. (6) When, in the exercise of its constitutional power, the Supreme Court refers a proceeding in *quo warranto*, which involves a charge of conspiracy, to a commissioner to report upon the law and the facts, his findings thereon will be accepted by the court as correct unless they are affirmatively and clearly shown to be wrong. State ex rel. v. Continental Tobacco Co., 177 Mo. 38; State ex rel. v. Standard Oil Co., 194 Mo. 164. (7) The organization of the International Harvester Company was brought about to restrain competition and was illegal. Whatever breaks down competition is destructive of public interest, and antagonistic to the public welfare. State ex rel. v. Firemen's Fund Ins. Co., 152 Mo. 1; United States v. Addyston Pipe &. Steel Co., 54 U. S. App. 747. The provisions of the common law, and its remedy of refusing to enforce these tainted contracts, were not entirely sufficient to guarantee the preservation of this sound policy, and,

in order to make it more effective and to circumvent the artifices and various new forms to which monopolists resorted as the exigencies of the times required, sweeping legislation along this line was enacted by practically all of the States, as well as the National government. From time to time amendments to these statutes have been added until now it seems they are quite sufficient to suppress the evil in all its forms whenever they are applied by courts which probe beneath the thin surface and decide without favor.    The Legislature of this State has performed its full duty in this respect, and if trusts and combinations are permitted to flourish here, the blame cannot be charged to that department.    R. S. 1899, secs. 8965, 8966, 8967, 8971 and 8978.    This statute is comprehensive enough to meet all cases, and cover all forms, however skillfully contrived.    Noyes on Intercorporate Relations (2 Ed.), secs. 307, 310.    Beach on Monopolies and Industrial Trusts, sec. 159.

*Selden P. Spencer* and *W. M. Williams* for respondent.

(1)    The decision in this case becomes one of great practical importance to all persons and corporations doing business in Missouri.    In an age "where modern industrial conditions are such that combination is not only necessary but inevitable," and when the uniting of properties and doing business on a large scale is an "economic necessity," it is of supreme importance that the commercial world should know precisely the line demarking the legitimate corporation from the illegal "trust."    It presents the problem of construing the laws of Missouri in such a plain and practical manner that they may effectively and completely protect the people from the evils which these laws were designed to cure, without interfering with legitimate business development, or running counter to irresistible economic laws.    But this court has already

dealt with that problem, and its decisions in former cases give the rules for its rational and practical solution. As said in C. C. C. & I. R. Co. v. Closser, 126 Ind. 348: "The important thing to be secured is a sound and salutary general principle, and not merely cases with closely resembling facts." In the same case the court said: "We are not required to decide nor do we decide, that combinations fair to the public, untainted by any sinister design, and formed solely to prevent the destruction of business by unregulated competition, may not be valid." (2) These enactments were intended to be of practical benefit to the public by preventing the evils resulting from conspiracies to restrain trade or to acquire a monopoly, and from contracts whose primary purpose and direct effect are to suppress competition. They were not designed to interfere with any use that individuals or corporations may make of their property which does not injuriously affect the rights of others. The statute applies to individuals and corporations alike. Continental Tobacco Co. Case, 177 Mo. 32. It must also be remembered that the magnitude of the business is not the test by which a violation of the statute is to be determined. United States v. Standard Oil Co., 173 Fed. 195. What does the statute forbid? (a) Every contract, agreement or combination of any character or kind whereby individuals or corporations, pretending to be separate and independent, limit prices, divide territory, fix the output, or by any other means stifle competition between themselves or restrain trade; and this regardless of the amount of business or extent of territory in which the parties to such agreement operate. State v. Armour Packing Co., 173 Mo. 356. (b) A joint selling agent who fixes the prices for the products of separate and apparently competing concerns is likewise condemned. This was the situation and the holding in the Finck and Euston cases, 187 Mo. 244, and 207 Mo. 289. (c) The holding and controlling of stock of competing

corporations by a board of trustees, so that all are placed under one joint management, although the plants belong to separate and independent corporations or individuals. People v. North River Sugar Refining Co., 121 N. Y. 582. (d) "Holding" companies, which own and control the stock of competing corporations and thus bring them all under one control while ostensibly the plants are operated separately. State v. Standard Oil Co., 218 Mo. 1. Corporations or individuals pretending to act independently while co-operating with each other to enrich themselves by preying upon the public, are especially harmful, since others desiring to enter the field are prevented, because it appears to be fully occupied by active competitors. On the other hand, if a single person or corporation actually owns and is operating these same plants as a single property, this condition invites rather than prevents the entrance of new competitors. This emphasizes the distinction between a consolidation of properties which is lawful and a combination of existing companies which is illegal. People v. North River Sugar Refining Co., 121 N. Y 624; See Appendix, p. 10. (e) Illegal combinations taking on a corporate form as a mere cloak or cover behind which constituent corporations "continue corporate life and activity through the instrumentality of another corporation." McCutcheon v. Merz Capsule Co., 71 Fed. 787; National Lead Co. v. Grote Paint Store Co., 8 Mo. App. 266. (f) The mere danger from a gigantic corporation, because of its power to harm which may never be exercised, is guarded against by our statute limiting, the capital stock of corporations which may be organized or licensed in this State. Lead Company case, 80 Mo. App. 247. What does the statute permit? (a) Certainly, it was not intended by the Legislature to interfere with the formation of partnerships between individuals simply because they are competitors in business. Such a partnership would not be illegal be-

cause the partners knew that by joining their energies in business, the former competition between them would cease and that this would be the necessary effect of their acts. Fairbanks v. Leary, 40 Wis. 643. (b) Likewise, the statutes expressly permit the consolidation of two manufacturing corporations, which, of course, is express authority to unite the plants and properties of competing corporations under one ownership. This right is not affected because the consolidating corporations desire to end competition between them. R. S. 1909, sec. 3403. (c) A corporation formed for the purpose of actually acquiring the absolute and complete title to properties and plants formerly in competition and of operating the same under a new management and control so as to secure greater efficiency and more economical administration, is not within the statutory prohibition merely because of the incidental ending of competition arising from such organization. Any other rule would prohibit competing individuals from forming partnerships and corporations, from purchasing the properties of others, or from consolidating with another. State v. Continental Tobacco Co., 177 Mo. 32. If there is a lawful business reason for the organization of a corporation to acquire the properties owned by others, the incidental effects upon competition resulting therefrom will not make the organization wrongful. In other words, the statute of Missouri says you may acquire, but you must not agree or arrange. You may consolidate, but you must not combine. You may do business on a large scale, but you must not deceive the public by pretending to be competing when you are not. You may unite under one ownership all the property you wish, but you may not organize in Missouri a corporation with more than $50,000,000 of capital or as a foreign corporation employ more than $10,000,000 here. If, therefore, a corporation organized by Mr. Perkins with capital entirely furnished by parties who had never been con-

nected with or engaged in the harvester business, could have purchased, under precisely the same circumstances and for the same purpose and with the same results (as seems to be conceded by the State) the properties and plants of the harvester companies whose plants were acquired by the New Jersey Company, upon what principle can the acquisition by the latter be held invalid? It will not do to say that the statute permits one and prohibits the other, because there is no such express permission or prohibition in the statute based upon the personnel of the stockholders in the new company. Continental Tobacco case, 177 Mo. 37; Sugar Refining case, 121 N. Y. 624. (3) This proceeding is against respondent, not the New Jersey Company, and respondent must be judged by its own acts. That respondent's stock was acquired and is now all held in the interest of the New Jersey Company's stockholders, does not affect its corporate life or identity. Kansas, etc., Coal Ry. Co. v. Northwestern C. & M. Co., 161 Mo. 288. Respondent has done no act in Missouri in furtherance of the alleged conspiracy. Respondent's sale of those products here is as free from illegality or injury as though made by local dealers, factors or jobbers. United States v. McLaughlin, 169 Fed. 302; Lonabaugh v. United States, 179 Fed. 476. Respondent has no monopoly in binders or mowers, and is an active competitor in twenty-one lines of agricultural implements.

VALLIANT, C. J.—This is an original proceeding in this court on the information of the Attorney-General, charging the respondent with violating the anti-trust laws of this State. There is not much dispute about the essential facts in the case; the difference between the parties consisting mainly in the contention on the part of the State that the acts that were done by the respondent and its associations were done for the purpose of suppressing competition and regulating

prices, and the contention on the other hand that the acts were done for the purpose of bringing about a more rational and conservative method of conducting the business of manufacturing and selling agricultural implements within the legitimate bounds of the law and with no purpose of creating a monopoly or suppressing competition, or regulating prices, in the sense that those terms are used in the statutes.

The respondent is a Wisconsin corporation chartered in 1881, under the name Parker-Dennet Harvesting Machine Company, to engage in the business of manufacturing and selling harvesting machines, that is, binders, mowers, etc., and other agricultural implements. It was located at Milwaukee, Wisconsin, and conducted its manufacturing business there. Its name was afterwards changed to Milwaukee Harvesting Company and under that name it was licensed to do business in this State in 1892. It established itself here and conducted its business of selling its own manufactured articles until the occurrence of the events herein complained of by the State, since which time it has conducted a business of selling only the products of the International Harvester Company, a New Jersey corporation, which corporation will be hereinafter more particularly referred to and discussed. After the organization of the last named corporation it acquired all the stock of respondent and respondent's name was again changed, the last name being the International Harvester Company of America; the words "of America" alone distinguishing its name from that of the New Jersey corporation. Respondent is frequently referred to in the evidence as the "Milwaukee," and for convenience and ready distinction we shall sometimes refer to it by that name.

Besides the Milwaukee Company there were other foreign corporations, manufactuers and sellers of farm implements of the same or similar character, licensed to do business in this State, among them: the

McCormick Harvester Company, an Illinois corporation; the Plano-Manufacturing Company, also an Illinois corporation; the Warder-Bushnell & Glessber Company, an Ohio corporation, and the D. M. Osborne and Company, a New York corporation. In addition to the above corporations the Deering Company, which was an Illinois copartnership, was also a manufacturer and seller of harvesting machines and doing business in this State. The manufacturing plants of all these concerns were located in their respective State domiciles; the business they conducted here was that of selling their manufactured products. There were other concerns engaged in like business, but the six companies above named, including respondent, were the chief concerns, and in 1902 (which was the date of the alleged unlawful combination), and for several years prior thereto, they did from eighty to ninety per cent of all harvesting machine business in the United States and in the State of Missouri. The commissioner has listed these companies in the rank of the relative volume of business done by each as follows: (1) the McCormick, (2) the Deering, (3) the Warder-Bushnell & Glessner, (4) the Plano, (5) the Osborne and (6) the Milwaukee. The machines of each company bore the company's trade-mark for a name: "McCormick," "Deering," "Champion" (the Warder-Bushnell & Glessner), "Plano," "Osborne" and "Milwaukee," and were well known to the trade by their respective trade-marks.

In 1902 and for several years prior thereto a very active, an unusually active, competition was practiced by these companies between themselves and others engaged in like business. The commissioner describes the competition as "active, persistent, strenuous and fierce." Respondent describes it as "a bitter wasteful warfare, of a sort never known in any other business in the world." It also says: "Competition was not fair and business-like, such as the law encourages, but

a fierce conflict, causing the ruthless ruin of competitors," and of no fair advantage to the farmer. To avoid the disasters with which that condition of the market seemed to threaten the companies engaged in the harvester machine business, the International Harvester Company, the New Jersey corporation, was on August 12, 1902, created, and into it was merged all the properties and business of five of the companies above named, to-wit, the McCormick, the Deering, the Warder-Bushnell & Glessner, the Plano, and the Milwaukee, and in January, 1903, the New Jersey corporation purchased all the stock of the Osborne company and thereupon all the property of that company was transferred to the New Jersey company. Thus in January, 1903, the New Jersey company had acquired the plants and properties of the companies that theretofore had manufactured and sold eighty or ninety per cent of all the harvesting machines in the United States and to that extent it thereafter dominated the market. During 1903 it acquired control of the Altman-Miller Company, an Ohio corporation, that manufactured and sold a harvesting machine called the "Buck-Eye," and it has since acquired the properties of other concerns engaged in manufacturing harvesting machines and other farm implements in the United States and properties outside the United States. The commissioner finds the value of all its assets to be, on January 31, 1907, $156,282,454.16.

The New Jersey corporation is engaged in manufacturing all of the harvester machines above named and putting them on the market under their respective names, the "McCormick," the "Deering," the "Champion," etc., and the respondent is its sole agent for putting its products on the market. The negotiations which ended in the organization of the New Jersey company were conducted by Mr. Perkins of the banking house of J. P. Morgan & Company, and they were

the result of his reflections on the situation of the harvester machine business prompted by a visit of Mr. McCormick to him in 1902. The object of Mr. McCormick's visit was to obtain money to extend the business of his company. He was fully conscious of the danger to his business threatened by the fierce competition of the other concerns who were his rivals; his was the strongest one of them all, but he wanted to gain more strength to enable him to compete with his rivals successfully. He did not at that time have any idea of forming a combination with his rivals to allay competition and control the market. His talk with Mr. Perkins was in furtherance of his purpose to obtain more money to extend his business, and there was nothing said between them at that time indicative of a purpose to form a combination. Having fully laid his purpose before Mr. Perkins, the latter took time to consider it, and they parted with the understanding that they would meet again. Mr. Perkin's reflection led him to the conclusion that the conditions were favorable for the introduction into the field of a great corporation to engage in manufacturing harvester machines and other agricultural implements. With this idea in his mind when they met again, Mr. Perkins proposed to Mr. McCormick to purchase his plant. The matter was fully discussed and the proposition was agreeable. Mr. McCormick was willing to sell and Mr. Perkins to buy at a price to be agreed on, based on a fair valuation of the property and business. Mr. Perkins had in mind then the purchase of other concerns and was negotiating with them, and Mr. McCormick knew that fact. During these negotiations Mr. Perkins bought for J. P. Morgan & Company all the assets of the Milwaukee Company and paid for them in cash. That seems to have been an outright purchase, not dependent in any degree on the consummation of the negotiations looking to the purchase of the assets of the other companies. Mr. Perkins testi-

fied that he would have bought the McCormick Company even if he could not have obtained the others. He testified that after talking with McCormick he negotiated with the managers of the other companies, trading with each separately. "After finding out what I could buy the companies for, I tried to pay them in the best coin I had to deliver and they agreed to take stock in the new company in payment." Except with the Milwaukee company there was no concluded contract of purchase, but only an agreeable understanding, until July 28th, 1902, when the respective representatives of all these companies met around a table in New York and each one then and there signed the contract for the sale of the assets of the company he represented. Up to that time there was never a meeting of the representatives of those companies to discuss and agree upon the plan of organization. The negotiations were conducted by Mr. Perkins, or under his direction, with each company separately. He testified that he bought the property of each company, just as he would buy a horse in the market. The evidence shows, however, that each company knew that like negotiations were going on with the other companies and each agreed to take pay in stock in a company to be formed. At the date of the signing of the contracts the respective representatives of the companies had come to New York in relation to this business, but they had held no communication with each other, they came together for the first time when they signed the contracts; these contracts were all alike and were prepared and ready for signature when the parties met around the table.

It was not a joint contract, but each executed a separate one transferring to the trustee named all the property and rights of every description, including accounts and bills receivable, trade-marks, trade names and good will of his company. And it was provided: "The purchase price to be paid by the purchaser to

the vendor for all and singular said property shall be the aggregate of the several appraisals and valuations hereinafter provided for and of said accounts and bills receivable and cash, if any, and shall be payable in full-paid non-assessable shares of the capital stock of said purchasing company taken at par." The purchasing company referred to was the New Jersey corporation to be thereafter organized, the immediate transfers being to a trustee to hold until that organization. The acts of the representatives of the several corporations were duly sanctioned and approved by the stockholders of the respective companies, and by the partners in the Deering Company. The agreement to take pay in stock of the company to be formed applied to all the companies except the Warder-Bushnell & Glessner Company; the exception as to that company was made because it was discovered that part of its capital stock was owned by two estates, therefore the proportion belonging to those estates was to be paid in cash, the rest in stock.

All of the contracting companies parted with all their assets of every description and good will, leaving them only the shares of stock which were of no use or value. The next step was the organization of the International Harvester Company under the laws of New Jersey with a capital stock of $120,000,000, which was distributed as follows: J. P. Morgan & Company, having paid for the property and stock of the Milwaukee Company, $3,148,196.66, and their services and expenses in the organization being estimated at $3,451,803.34, they were awarded stock to the amount of $6,600,000; the tangible properties of the McCormick, the Deering, the Warder-Bushnell & Glessner; and the Plano having been appraised at $53,400,000, and their guaranteed bills receivable and accounts at $40,000,000, stock to the amount of $93,400,000 was distributed to them, and the remaining stock to the amount of $20,-000,000 was issued to individuals who subscribed for it.

After the organization of the New Jersey corporation, all the other companies that had been absorbed by it ceased to do business and thereafter the business of manufacturing and selling harvester machines and other farm implements was conducted by the New Jersey corporation. But because some States would not admit into their borders a corporation of such large capital stock, and others imposed a license tax that the managers thought was unreasonable, it was decided that the corporation would limit its operations to manufacturing the machines and implements, and would employ another concern which would not be objectionable to the laws of those States, to sell its products. For this purpose the managers of the New Jersey corporation turned their attention to the respondent in this case, then called the Milwaukee Harvester Company, the property of which the New Jersey corporation had already acquired, and the stock of which it also owned. The advantage of using this respondent also appeared by the fact that it was already licensed in the States where it was desired to go, and it could operate in those States as the selling agent of the New Jersey corporation under the licenses that it already had. The International Harvester Company (the New Jersey Corporation), being then the owner of the stock of the respondent, the Milwaukee Company, caused the respondent's name to be changed to the International Harvester Company of America, and chose its board of directors, and since then the respondent has been engaged exclusively in the business of selling the machines and implements manufactured by the New Jersey corporation.

Its mode of doing business was to appoint at different places in the State what it called a "sales agent" who was to conduct the business of selling the machines under certain specifications and limitations set out in an elaborate contract on a printed form. This contract for the first three years contained a

clause requiring the agent to sell all the machines or property received by him under the contract at such prices and on such terms as might be fixed by respondent or its general agent, and also an agreement on the agent's part not to accept the agency of any other concern in like business; but those restrictions were eliminated from the contract used in 1906 and thereafter. Under the contract after those clauses were eliminated, the agent was required to pay the company a certain price for each machine sold, and whatever he might get in excess of that price was his commissions. The sliding of the price at which the agent might sell was within the margin of his own commissions, the price he was to pay the company was fixed. The evidence showed that there was considerable competition in the trade after the absorption of the competing companies; some of the witnesses, who were agents, testified that there was as much competition after 1902 as there had been before that date. But the competition there spoken of was chiefly between the agents selling the different machines made by the New Jersey corporation; that is, an agent who had the selling of a "McCormick" would compete with one selling the "Deering" or the "Champion" or the "Buck-Eye," etc., and it was within the margin of the agent's commissions. And the evidence showed that there were three independent companies in the market competing with the agents of the respondent, and they did a good business. But as compared with the volume of business done by the respondent that done by the independent companies was small. In entering into the contract the agent was permitted to select either the "McCormick," the "Deering," the "Champion," the "Plano," the "Osborne" or the "Milwaukee," but was generally confined to one line.

The evidence also shows that the price of Harvester machines was not materially higher after the New Jersey corporation entered the field than it was before,

until 1908, when it was increased eight or ten per cent; whilst in the meantime there had been a greater increase in the price of the material and labor used in their construction. The evidence also shows that whilst harvesting machines were the chief products of the companies absorbed by the International Harvester Company, that company has greatly enlarged its business and extended it to many other farm implements, and has thus put itself in competition with the many concerns that theretofore were and still are engaged in manufacturing such other farm implements and the farmers generally have profited thereby. The evidence also shows that the machines manufactured by the International Company have been greatly improved in quality and the item of repair material has been reduced in price and placed within closer reach of the farmer. On the whole the evidence shows that the International Harvester Company has not used its power to oppress or injure the farmers who are its customers.

I. In 1902, when the negotiations which led up to the organization of the International Harvester Company were begun, competition between the large harvester machine companies in the United States was such as to reduce the market to a condition that was deplorable from the standpoint of the competing companies and it is not certain that its tendency was towards the ultimate advantage of the consumer of those machines. Whilst the tendency of fair competition is to produce a wholesome condition of the market, yet competition may be of such a character and so designed as to destroy the weaker competitors, leaving only the giant in the field, who then would have a monoply of the market. The law is not interested alone in the consumer, but it has regard also for the producer and would, if it could, protect a small manufacturer or dealer from the destruction that the avarice of a

powerful rival might design.  Therefore, the argument of the learned counsel for the respondent is not without force, that the competition that existed in 1902 in the harvester machine market was not the kind of competition that the lawmakers had in mind when they enacted the anti-trust statutes.  But unfortunately for that argument it is impossible for the Legislature to prescribe a general rule by which competition conducive to a wholesome condition of the market can be distinguished from a competition that is demoralizing and disorganizing.  In a late case (Standard Oil Co. v. United States, 221 U. S. 1), the Supreme Court of the United States held that the act of Congress which prohibits contracts in restraint of trade was to be construed in the light of reason, and when so construed it did not forbid the making of every contract that had for its purpose a restrain of trade, but only such as had for its purpose an unreasonable restraint of trade; and, for an example, the court referred to contracts whereby a voluntary restraint would be put by an individual on his own right to carry on his trade or calling; contracts of which character were by the common law of England at one time held to be void, but the doctrine was afterwards modified so that it was only when a restraint by contract was so general as to be coterminous with the kingdom that it was treated as void. Reading the whole opinion in that case we infer that when the court says a reasonable restraint of trade is not forbidden by the statute, it refers to the restraint which is placed on the trade by the terms of the contract or by the act in question.  Under that decision as we understand it, if a contract provides for a reasonable and lawful restraint of trade it is not forbidden by the statute or if the act done is potential only of such a reasonable restraint it is not condemned.  Under the rule there laid down if a contract in question or an act of combination is significant or potential only of a reasonable restraint of competition it is not within

the condemnation of the statute. But when a contract or act of combination is to be upheld on the theory that it is only a reasonable restriction on trade, it must appear on the face of the contract or act that the restriction which it creates is limited within reasonable bounds. It will not avail one who attempts to defend a contract unlimited in its terms or an act that is unlimited in the apparent scope of its power, to say that it will be used only in a moderate degree. The law is jealous of an unlimited power in such case in whosesoever hands it may be placed. After laying down the rule of reasonable construction the court turned to the facts of that case and held that the acquisition of power by the Standard Oil Company betokened its unlawful purpose. The court said: "Because the unification of power and control over petroleum and its products, which was the inevitable result of the combining in the New Jersey corporation by the increase of its stock and the transfer to it of the stocks of so many other corporations, aggregating so vast a capital, gives rise, in and of itself in the absence of countervailing circumstances, to say the least, to the prima-facie presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination which were resorted to in order that greater power might be added than would otherwise have arisen had normal methods been followed, the whole with the purpose of excluding others from the trade and thus centralizing in the combination a perpetual control of the movements of petroleum and its products in the channels of interstate commerce."

And again the court said: "So far as the decree held that the ownership of the stock of the New Jersey corporation constituted a combination in violation of the first section and an attempt to create a monopoly or to monopolize under the second section and com-

manded the dissolution of the combination, the decree was clearly appropriate."

In the case at bar we are to take the acts of the parties and judge their purpose by the consequence that would naturally result. When men deliberately and intelligently go to work and acquire power that will enable them to control the market, if they choose to exercise it, there is no use for them to say that they did not intend to control the trade or limit competition, nor when the legality of their act of acquisition is in question is it any use for them to say we have not used the power to oppress any one. Counsel for respondent argue that the mere possession of power incident to the possession of wealth is not unlawful if it is not unlawfully exercised, and that is so. Wealth is power, and it may, without violation of law, be exercised to influence the market. The statute we are now considering is not designed to limit the amount of wealth one may lawfully acquire, therefore not designed to limit the influence that wealth may exert, but it is designed to forbid the acquisition of power for the purpose of influencing the market by combinations of interests that otherwise would compete in the market. The law regards such a power acquired by such a combination as dangerous to the rights of the people and forbids its acquisition. If immediately on the organization of the International Harvester Company and its appointing the respondent to act as its agent and before any of its products were put on the market an information in *quo warranto* had been presented in court against it, it would have been no answer to the complaint for the respondent to say: True it is we have this power, but we are not going to use it to the injury of the farmers or of other dealers in the same kind of implements. Neither is it any defense, after operating under the power for a time, to say we have not up to this date used the power to injure anyone.

Doubtless it could have been well said in behalf of the Standard Oil Company in the case above cited, that under its operation the price of coal oil had not been increased and that many products of petroleum other than illuminating oil, not before known or used, had been developed, and on the whole the public had been benefitted, although in the acquirement of the power small producers and dealers may have been driven out of business and ceased to compete in the market.

So in the case at bar: the price of harvesting machines has not increased in proportion to the increased cost of construction, or the increased merit of the machines, and respondent has brought other farm implements into trade, and it is also true that not all, though some of the smaller concerns that were competitors on the market, have ceased their struggle for existence and retired from the field.

There can be no doubt but that the competition that existed between the concerns that were engaged in manufacturing and selling harvester machines in 1902, was the moving cause of the organization of the International Harvester Company, and there can be no doubt but that that competition ceased when that corporation took charge of the business. The suppressing of that competition may not have been Mr. Perkins' purpose; he may have thought that he could organize a great corporation that could live and prosper in spite of competition. He bought the Milwaukee Company without waiting to see what he could do with others, and he said that he would have bought the McCormick even if he could not have bought the others. But we are not concerned with what he would have done, our attention is directed to what he did, and that was the buying of all these concerns and combining them in one corporation, with the result that the fierce competition that had existed ceased. He said that he bought the property of each of these companies

just as he would buy a horse in the market.  He was probably mistaken in that figure of speech.   This transaction was conducted with great skill and ability and evidently with an eye on the anti-trust statutes of this and other states, with the purpose of either avoiding or evading those statutes.  Whilst the negotiations with each company were conducted separately yet they were conducted with reference to the result of like negotiations with the other companies.  No definite contract of purchase was concluded with either company, except the Milwaukee, until like contracts were made with the others and the agreement to take pay in stock of the corporation to be formed showed that the managers of each company knew of what the corporation was to consist.  The managers of these several corporations were men of conspicuous business intelligence, they would never have agreed to sell the property of their companies and take pay in stock of a corporation to be formed unless they knew of what that corporation was to consist.  The fact that they did not all get together and agree to merge their companies in one, but on the contrary each conducted its part of the scheme in form as if it were simply making a sale of its property, shows that they were acting in fear of the anti-trust statutes.  And the fact that they did not all sign one contract, but each a separate one, shows caution to avoid the appearance of combination, yet when all the several contracts were signed the effect was the same as if they had all signed one contract. And the fact that the representatives of the five companies were all in New York on that business at the same time but stopping at different hotels and holding no communication with each other again shows caution.  If there had been no anti-trust laws in the land and these gentlemen had all concluded, in order to suppress what they call this unbusinesslike and ruinous competition, to unite their interests in one great company (as in fact they did), the most natural thing for

them to have done would have been to meet together and talk it over and agree on the details. In the case above cited the Supreme Court of the United States, commenting on the comprehensive terms of the anti-trust act of Congress, which in that particular is like our statute, said: "In view of the many new forms of contracts and combinations which were being evolved from existing economic conditions, it was deemed essential by an all-embracing enumeration to make sure that no form of contract or combination by which an undue restraint of interstate or foreign commerce was brought about could save such restraint from condemnation." And so we say under our statute the form of contract under which this combination was brought about cannot save it from condemnation, and respondent cannot escape the result by saying it was not designed to suppress reasonable competition, but only the ruinous and unbusinesslike methods that were then in practice, because there is no such limit in the power conferred.

We hold that the International Harvester Company, the New Jersey corporation, is an unlawful combination to suppress competition and regulate prices within the meaning of our statute, and therefore it has no right to do business in this State.

II. The respondent the International Harvester Company of America, the Wisconsin corporation, is doing business in this State under a license issued to it by the Secretary of State in 1892. At that time it was an independent corporation under the name of the Milwaukee Harvester Company, manufacturing and selling its own harvester machines. Of this corporation the commissioner says: "This corporation and its stockholders once had capital, now it has none; everything that it or its stockholders once had now belongs to the International Harvester Company. . . . The respondent in truth and in fact is a mere

sales department of the International Harvester Company."

At the date of the organization of the International Harvester Company and at the time it began doing business in this State through the agency of the respondent, it could not have obtained a license in its own name, because at that time our law did not admit into the State a foreign corporation of such large capital, but since then our statute has been amended and the amount of the capital is now no objection. But the fact is the International Harvester Company began doing business in this State through the agency of the respondent at a time when, even if it was otherwise entitled, it could not have obtained a license in its own name. And although now the amount of its capital stock would not exclude it from the State yet the fact that it is an unlawful combination in the light of our anti-trust statutes would exclude it. What a principal is forbidden to do in his own name he cannot do through an agent. If a principal has no authority, he cannot confer authority on an agent.

There is another aspect in which the respondent appears. When the respondent obtained its license to do business in this State it was an independent corporation manufacturing and selling its own machines and it was for the purpose of selling its own product that the license was granted. It now has no business of its own, no property, no independent existence, it is in fact a mere sales department of the International Harvester Company, which company has never been licensed to do business in this State. We do not mean to say that the respondent while doing the business for which it was licensed in 1892 could not also, if its charter so provided, have acted as agent for some other concern and sold its goods, provided the other concern could have lawfully sold its own goods, but whether when the respondent committed a complete abandon-

ment of the business for which it was licensed, had no longer any business of its own, it could take up a mere agency, is a question worthy of consideration. But perhaps there is no use deciding that question since we have already concluded that respondent's principal has not and has never had any right to do business in this State, therefore as its principal's agent respondent has no such right. The amount paid by respondent for the license issued to it in 1892 was $62.50, which was the minimum tax prescribed by the statute, and was estimated on the representation of the respondent at that time as to the proportion of its capital stock, which was $750,000, represented by its business in this State. The International Harvester Company with a capital of $120,000,000, even if it was not otherwise excluded, could not lawfully use the license based on an estimate of the proportion of the capital stock of another company which was less than a hundreth part of its capital. If such were permitted corporations with enormous capital would soon learn to organize or acquire smaller ones and send them into the State to do its business with a minimum fee.

III. We have already said in effect that when a party is called into court to answer a charge of unlawful combination in restraint of trade, it is no defense to say that the power thus acquired has been or will be used with moderation. But after the court has adjudged the party guilty of the act charged and comes to consider the penalty to be adjudged, the past conduct of the party in the exercise of its power is a fact worthy of consideration. Our anti-trust statute says that if the party found guilty of the act forbidden is a domestic corporation its charter shall be adjudged forfeited, and if it is a foreign orporation its right to do business in this State shall be adjudged forfeited. Besides the statute, we have the common law on the subject of combinations in restraint of trade and the penalties

under that law; in this respect the State courts have a jurisdiction that the Federal courts, who have no common law jurisdiction, do not have.

In determining the penalty to be adjudged in a case of this kind the court should have regard to the consequence to follow its decision. It would be an injury to the people of this State to forbid the International Harvester Company to do business here; therefore, whilst we must obey the mandate of the statute and pronounce à judgment of ouster, yet, we may suspend the execution of the judgment, as this court in some cases has sometimes done, on terms that would be fair to the corporation and conducive to the welfare of the people of the State.

One of the evils intended to be guarded against by the law is the enhancing of prices to the injury of the consumer, but that is not the only evil that may be done by a great power in the market; the driving of small competitors out of the trade is a wrong that the law would prohibit. This is not a paternal government, and the State does not undertake to deprive one of the advantage his greater wealth gives him in the market over one of smaller means, but it does undertake to prevent a combination of interests to drive others out of the market. If the International Harvester Company were disposed to exercise the power its enormous wealth gives, and if it were left unrestrained to do so, it could drive every competitor it now has from the field. In considering what restraints the court in this case, in that respect, should impose, we experience difficulty. A company of so much strength has the power to temporarily reduce the price of its goods to such a degree as that all competitors would be compelled to either sell out or quit the business, and when the field by such means would be cleared the prices would be at the will of the survivor. There would be no advantage to the people in that. On the other hand it will not do to say that this com-

pany shall not, because of the superior facilities it possesses for economical manufacturing, put its products on the market at a price that other concerns possessing less facilities cannot afford, and must therefore leave the field. Nor, will it do to say that this corporation shall not buy out the smaller manufacturers and dealers, for that might be unjust to the latter, depriving them of an opportunity to sell when they so desired.

If the International Harvester Company is to be permitted to continue to do business in this State, either in its own name or through the agency of respondent, it must be on condition that it shall not use its power either to force a competitor to sell or drive it out of the market by unfair methods, and that it will not raise the prices of the articles it sells beyond a fair profit on their cost and the expense of marketing the same. And since the International Harvester Company has been doing business in this State, through the agency of respondent, under license that it had no right to use, it should pay to the State a reasonable sum for the privilege enjoyed, and it should take out a license in its own name under the terms and conditions prescribed in section 3039, Revised Statutes 1909, and pay therefor the tax in that section prescribed, estimated on the proportion of its capital stock represented by its property and business in Missouri, and subject itself to all the requirements of foreign corporations doing business in this State prescribed in article 1 of chapter 33 of the Revised Statutes of 1909. The license so to be taken out to stand revoked if at any time hereafter on motion of the Attorney-General it be made to appear to this court that the corporation, either in person or by its agent, has violated any of the conditions above specified. If the International Harvester Company sees fit to comply with the terms above specified it may carry on its business

237 Sup.—26

in this State either in person or through the agency of the respondent, but not on the respondent's present license.

The International Harvester Company not being a party to this suit, of course we can impose no fine or other penalty on it; it not being in this State it is not subject to expulsion from our borders, we can only affect it in the person of its representative, the respondent.

The judgment is that the license issued to respondent in 1892 to do business in this State is hereby revoked, and that respondent pay the costs of this suit. But it is further adjudged that if the International Harvester Company shall within sixty days pay the above mentioned reasonable sum to be fixed by the court on motion to be hereinafter made and shall take out a license to do business in Missouri on the terms and conditions above specified, it may conduct its business here either in its own name or through the respondent as its agent until the license expires by law or a breach of one or more of the conditions above mentioned.

*Lamm, Ferriss* and *Brown, JJ.*, concur in all except the judgment suggested in this opinion; *Kennish, J.*, not sitting, having been of counsel.

## SEPARATE OPINION.

GRAVES, J.—I. I do not concur in all that has been written by the learned Chief Justice in this case, nor do I concur at all in the manner in which he finally disposes of the case. I do, however, concur in much that he has said.

The opinion as presented simply ousts the International Harvester Company of America, but fixes no fine as against it. In the judgment of ouster I concur. The above company is the only one before this court, and the only one which can be reached by

this court, and if a penalty is to be fixed for the violation of our laws, such penalty must go as against the sole respondent in this case.  I agree further that we may suspend the ouster upon terms, if we see fit to grant terms.  I cannot concur in that portion of the opinion, which reads:

"And since the International Harvester Company has been doing business in this State, through the agency of respondent, under license that it had no right to use, it should pay to the State a reasonable sum for the privilege enjoyed, and it should take out a license in its own name under the terms and conditions prescribed in section 3039, Revised Statutes 1909, and pay therefor the taxes in that section prescribed, estimated on the proportion of its capital stock represented by its property and business in Missouri, and subject itself to all the requirements of foreign corporations doing business in this State prescribed in article 1 of chapter 33 of the Revised Statutes of 1909.  The license so to be taken out to stand revoked if at any time hereafter on motion of the Attorney-General it be made to appear to this court that the corporation, either in person or by its agent, has violated any of the conditions above specified.  If the International Harvester Company sees fit to comply with the terms above specified, it may carry on its business in this State, either in person or through the agency of the respondent, but not on respondent's present license."

The International Harvester Company is not before this court, and we have no right to place restrictions upon it by way of a judgment.  If it desires to do business in this State it has the right to make application to the proper State officer for a license so to do, unhampered by a prejudgment in the matter by the opinion of this court in a case to which it was not a party.  To determine the status of the respondent, the International Harvester Company of America,

we have the right to determine the character of the relations which it bore to the International Harvester Company, the big corporation, and the character of the business done by each. We have also the right to say whether by contract or otherwise the relationship and business of the two are such as to subject the respondent in this case to the penalty prescribed by the law, but we can go no further in our judgment and say that the International Harvester Company shall take out no license to do business in this State until it pays a fine prescribed by a judgment in a case to which it is not a party. To my mind our whole judgment should be as against the International Harvester Company of America, the only company subject to the jurisdiction of this court. That judgment in my opinion should be one of ouster, and in addition thereto a fine of not less than $50,000. Whether the ouster may be stayed upon terms may be a matter for further consideration. My reasons for these conclusions I prefer, as indicated above, to express in my own way.

II. We have now in this State, and so had at the time of the institution of this suit, a statute (Sec. 10301, R. S. 1909) which reads:

"All arrangements, contracts, agreements, combinations or undertakings made, or entered into between any two or more persons, designed or made with a view to lessen, or which tend to lessen, lawful trade, or full and free competition in the importation, transportation, manufacture or sale in this State of any product, commodity or article, or thing bought and sold of any class or kind whatsoever, including the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, and all arrangements, contracts, agreements, combinations or understandings made or entered into between any two or more persons which are designed or

made with a view to increase, or which tend to increase the market price of any product, commodity or article or thing, of any class or kind whatsoever bought and sold, including the price or premium to be paid for insuring property against loss or damage by fire, lightning or storm, are hereby declared to be against public policy, unlawful and void; and any person or persons creating, entering into, becoming a member of or participating in such arrangements, contracts, agreements, combinations or understandings shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and punished as provided for in this article."

The part to which I desire first to apply the facts in this case, stripped of all useless verbiage, would read:

"All *arrangements*, contracts, agreements, *combinations* or understandings made, or entered into between any two or more persons, *designed* or made with a view to lessen, or which tend to lessen . . . *full* and *free* competition in the sale . . . in this State of any product, commodity or article, or things bought and sold . . . are hereby declared to be against public policy, unlawful and void; and any person or persons creating, entering into, becoming a member of or *participating in* such *arrangements*, contracts, agreements, *combinations* or understandings shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and punished as provided for in this article."

The punishment is fixed by section 10304, which follows in the article.

It will be noticed that our statute is exceedingly broad. It includes not only contracts, agreements and understandings, but also all *arrangements and combinations*. It includes not only all those things which tend to lessen full and free competition, 'but likewise all those things which were done *with the view of less-*

*ening full and free competition.* In other words, this statute punctuated and worded as it is, covers two classes of "arrangements, contracts, agreements, combinations and understandings"; i. e., (1) those that were made "with the view to lessen . . . full and free competition", but which may have never been so operated as to reach the result had in view or in mind; and (2) those made "which tend to lessen . . . full and free competition" and which in fact did lessen competition.

I repeat that this statute when fairly analyzed thus resolves itself, so far as the question under discussion is concerned. The several clauses purposely placed therein by the lawmaking power do not mean one and the same thing, but were put there purposely to be far reaching in effect. It was intended to reach all conceivable methods which might be designed by shrewd "captains of finance." The purpose of the statute was to thwart action in the very incipiency as well as all down the line. It was designed to reach all arrangements, etc., which were designed and made with the view of lessening competition, as well as those which in fact did that thing. Either class falls equally under the ban of the statute—one no more nor less than the other. To my mind the respondent in this case is guilty under either portion of the statute, as thus analyzed. We should perhaps add that section 8966 of the Revised Statutes of 1899 condemned the same "*arrangements,* contracts, agreements or *combinations.*"

In that statute we have the same two classes as in the present statute. We apply the facts to the first class only in the succeeding paragraph.

III. That there was an arrangement between the respondent and four other leading manufacturers of binders and reapers in 1902 is beyond question. That respondent, through J. P. Morgan & Co., en-

tered fully into that arrangement there is no question. Now, was such arrangement made with the "design and view of lessening full and free competition"? If so, then such arrangement violated our laws, and if respondent was a party thereto it was at the time and is now guilty. This arrangement must be stamped and branded as of the date of its making. The question is, what was its "design and view" at the time made? If unlawful then, it remains unlawful. Let us now revert to the facts. In 1902, and for some years prior thereto, there were six concerns licensed to do business in this State, i. e., (1) the respondent, then known as the Milwaukee Company; (2) the McCormick Company; (3) the Deering Company, a copartnership; (4) the Warder-Bushnell & Glessner Company; (5) the Plano Company, and (6) the Osborne Company. These companies at that time did eighty to ninety per cent of the binder, reaper and mower business in this State. They were then in actual and unrestricted competition in the sale of binders, reapers and mowers in this State. To make sales they would cut prices. Every syllable of evidence in this record shows that there was then actual competition. The same evidence likewise shows that after 1902 there was no real competition. The International Harvester Company, acting through its agent, the respondent herein, fixed the prices of each machine to the retailer and permitted no deviation therefrom. The only possible chance for competition was by the agent cutting off a part of his commission. The machines were listed to the agent at a fixed sum and that sum had to be accounted for at the settlement. That there was real competition prior to 1902 and no competition since is best shown by a few excerpts from the testimony.

Mr. McCormick, one of the leading spirits in the International Harvester Company, in part, said:

"Q. Was a part of the unstable condition incident to this unsettled condition prior to the formation of the International Harvester Company, a variation from the list price and the selling of the machines—did that constitute a part of the unbusinesslike methods that you mention? A. The unbusinesslike methods were a multitude of things.

"Q. Was that a part of it? A. Yes, sir.

"Q. That is, the Deering people would have a machine listed at $90 and let the dealer have it at $80? A. Yes, sir.

"Q. Was that a common practice in giving rebates? A. All kinds of subterfuges for modifying prices, taking old machines at large values, throwing in other property, wasteful expenditure of money and time, and salary of men.

"Q. I was not asking you of what you complained in detailed statements—I asked you if the selling below list prices was one—was that true? A. Yes, sir.

"Q. Now, since that time you make one price on paper and get another price from the dealer? A. We do not.

"Q. You maintain the prices listed? A. Yes, sir.

"Q. And before that consolidation that was not done by any of the companies? A. Was not done so generally.

"Q. Well, the truth of the matter is that a very large proportion, if not the larger proportion, of the sales were made below the list price? A. I could not say about the larger proportion.

"Q. But a large proportion was? A. Yes, sir."

Mr. Glessner, of the Warder-Bushnell & Glessner Company, said:

"Q. You were all competitors of each other? A. Yes, sir.

"Q. Was there no understanding or agreement between you prior to 1902? A. No, sir.

"Q.   There was actual competition between you? A. Yes, sir.

"Q.   The fact is, the competition was pretty fierce?   A.   Yes, sir; we tried to make it so.

"Q.   The competition in the harvester business had been more pronounced in their early part?   A. No, sir; it grew in bitterness and extent right along.

"Q.   You think it increased?   A. Yes, sir.

"Q.   You think there was more competition in the harvester business in 1902 than any time before?   A. It depends on what you call competition; it was a bitter fight between everybody to get business and to get the better of your competitior."

Mr. Funk, the general manager of the International Harvester Company, said:

"Q.   Then you did cut prices on your machines, when you were with the Champion people, to get business?   A.   Yes, sir.

"Q.   Was there a uniform price to the dealers at that time, before the International Harvester Company of New Jersey was organized?   A.   No, sir.

"Q.   You sold the machines for what you could get?   A.   We had a list price but it was varied from in certain conditions."

Mr. Yancey, former general agent for the Deering Company, said:

"Q.   Did you at any time prior to 1902 reduce the price to the dealer because of competition?   A. Yes, sir.

"Q.   To what extent would you reduce the price in instances of that character?   A.   Well, my previous answer covers that case.   During the war of the competition we were pretty hard run for business, and if it looked as if we were going to carry machines over, and to protect ourselves we had to cut the prices.

"Q.   How much?   A.   Ordinarily five dollars, sometimes ten, in extreme cases maybe a little bit more than that.

"Q. In fact you frequently cut the prices in any way to sell? A. Not frequently.

"Q. So that the old instructions—or was not that the rules prior to 1902? A. It could not be said to be the rule.

"Q. It was rather frequently done, was it not, Mr. Yancy? A. It varied in different sections, sometimes the demand was greater, and the necessity did not exist in some years as in others.

"Q. Did you find that the necessity came up because other companies were also doing that? A. Yes, sir.

"Q. The McCormicks were doing that? A. Yes, sir.

"Q. And the Plano? A. Yes, sir.

"Q. The Milwaukee, The Osborne, and the Champion—they were all doing that? A. Yes, sir; more or less."

We shall not go further. There was actual competition between the six leading manufacturers in 1902 prior to the organization of what in plain language should be called the harvester trust.

In 1902, as stated by Judge VALLIANT, Mr. McCormick went east to get money to enlarge his business. The evidence indicated that these large concerns were not losing money, but as said by one of the parties, they were not making money on the trade in the United States, but were making money on their foreign business. Judge VALLIANT has detailed more than I shall as to how the arrangement was made. I want to note briefly, however, this *arrangement* or *combination* to lessen competition, for in plain English it was that and nothing else.

In the first place, J. P. Morgan & Company procured an option on the present respondent, then the Milwaukee Company. This covered the whole concern, lock, stock and barrell. Then Morgan & Company, as practical owners of respondent, were in a situation

to *arrange and combine* with others' in the harvesting machine business.   They did so arrange, but to give evidence of individual sales they had each party to the *arrangement* or *combination* sell by written contract to one Lane.   This is step number one.   Lane later conveyed to the International Harvester Company. This is step number two.   The International Harvester Company then proceeded to put its stock in the hands of voting trustees under a written agreement, forming a voting trust, which was to be in force for ten years, but which might be terminated in five years.   This is step three.   Then followed the sales agent's contract with the respondent in this case.   The stock held by these trustees was held in proportion to the amount put in by these several component corporations, save and except certain amounts fully discussed in the principal opinion.   Was this an *arrangement* or *combination* with the view of lessening competition?   It was not a bona-fide sale, because the sellers had to create their own buyer.   It was a device to combine all their property into one huge concern and for what purpose? In view of the facts and upon conscience can we say it was not done *with a view to lessen free and full competition?* We think not.   The parties themselves say that it was done to stop the fierce competition between these large manufacturers.   They further say that it did stop that competition, as is evident from the very arrangement itself.   The statute does not say that the arrangement must stop competition to bring it within the ban of the law.   If it was made with the *view* of *lessening* competition the arrangement and combination must be condemned.   Can it be said that when you have taken eighty or ninety per cent of a given trade, formerly in the hands of six corporations in open and fierce competition, and place it in the hands of three voting trustees with practically absolute power, you haven't by the very act itself lessened free and full competition in general trade?   We think not.   The

thing speaks for itself. The purpose is apparent. It would be years before the small concerns left, which did own ten to twenty per cent of the business, could gain strength and capacity to have any real competition.

The situation of the so-called competition which was left after this unlawful combination, is well described by Mr. Funk, the general manager of the International Harvester Company. He says:

"Q. Would not that guerilla warfare and competition, would it not be just as liable to occur with the Johnston, the Acme or Walter A. Wood as it did happen with the companies you spoke of awhile ago (referring to the six companies just mentioned)? No, sir.

"Q. Why? A. Because the companies who are active and aggressive always draw the fire of the others. The Wood and the Johnston and those other concerns were not as active, and they picked their territories, while these five companies were everywhere. It was a matter of pride and policy with us to be represented everywhere. The Johnston and the Wood and the few you spoke of had considerable trade in the East where competition was not quite as fierce, and they could pick out localities where conditions were favorable to them. They operated more where conditions were more favorable."

This refers to the condition just before the merger of interests. From this it appears that these little fellows doing from ten to twenty per cent of the business, were not doing business in all localities. The six companies were doing business everywhere. The little fellows picked their places. Under this testimony the merger in 1902 in many places not only lessened competition, but actually cut it off entirely. Imagine a place where the six big corporations each had agents and therefore active competition and where the little fellows in their caution had not located an agent.

They had to pick their places as stated by the witness. Look at our imaginary place a month before, and then again a month after the merger. Or if you please, a day before and a day after the merger. With this pen picture in mind can you say that the competition in the harvester trade was not in fact lessened by the arrangement and combination attacked in this suit? We think not. In the shades of a single night the six great warriors upon the field of active trade are gathered together into one fold and when morning comes competition has fled. Not only does the thing speak for itself, but the conspirators have spoken for it. They say, first, that prior to the creation of this good trust the manufacturers to meet competition often had to cut the prices from $5 to $15 per machine, and sometimes more.

These cuts were made by the manufacturer and not by the poor agent out of his commission. It was actual competition between the manufacturers themselves. But how the day after? A fixed price was established by the one giant owner of all. No cut is ever made. No competition between these six large manufacturers. General competition is lessened and in many places all competition destroyed.

The parties say what they did was done for the very purpose of stopping all competition between these large concerns. That it had that effect is evident.

We can judge the meaning of a contract by the construction the parties place upon it themselves. So also we can judge an act by the construction the parties place upon it themselves. The purpose of one act can be gathered by subsequent acts immediately following, which subsequent acts show that they were done in the course of carrying out the first. With this in view let us see what was done by the parties in 1903, 1904 and 1905. During these years their agency contracts contained this clause:

"5th. To sell all machines or property received under this contract at such prices and on such terms as may be fixed in writing by said company or its general agent in the territory herein mentioned."

The purpose there expressed is to fix the price to the consumer. It is true that this was dropped from the agency contracts of 1906, and thereafter, but it is yet potential as declaratory of the intent of the parties when they entered into this arrangement and combination. Public history discloses that about that time the State of Kansas was proceeding against the International, and this perhaps induced the change. By the same contract the agent's territory was limited so that he could not compete with other agents selling the same line, and further he was obligated not to sell the goods of any other manufacturer. Everything was done that could be done to destroy competition. Even the little competition between agents where they made cuts out of their commissions was provided against. These things from the parties themselves bespeak their construction of the arrangement and combination made in 1902. These are things that cannot be rubbed out of this record by the smooth talk of the head men or their sub-agents. They show that the whole transaction was done with the view of stifling competition. Not only so, but they show that it did in fact impede competition.

One thing more on the question as to what was the intent of these parties when they entered into this arrangement. In the voting trust agreement, the trustees were empowered to increase the capital stock to $180,000,000, without further consulting the parties interested. The evident purpose of that was to enable them to do just what they afterwards did. The D. M. Osborne Company and the Buckeye Company were not yet in the trust. The former was a strong competitor. In 1903 these two and other manufacturing companies were bought and taken in under the protecting wing

of the International. At the beginning, as above indicated, the way was prepared. Those things point unerringly to the conclusion that the action of the respondent and the other corporations joining it in the first instance made their deal and arrangement with the view to lessen competition. Not only did they purchase the corporations above indicated, but for two years thereafter they ran them in their former names, without disclosing their ownership. If this was not to deceive the officers of the law and leave some appearance of competition for awhile, why not?

Viewing this case from any standpoint, it is clear that the merger of all these interests in one giant concern was made for the purpose, to use the language of the law, "with the view to lessen . . . full and free competition," all in violation of our statutes as they exist now and as they have existed since 1897. Nor is there any doubt that the respondent is and ever has been a party to such unlawful arrangement.

IV. Nor do I fully concur in the statement that there has been no violation of the other portion of the statute which denounces arrangements and combinations to increase the market price. I think this arrangement and combination under the facts of this case was made for that purpose. The principal opinion states the facts as to the amount of raise made by respondent in prices, and also states that there was a raise in the cost of material and labor. Grant the latter to be true, which we must, for the evidence so shows, yet there are other facts in the record which show this raise was not demanded for that reason. The new scheme cut off an army of employees and great amount of expenses. Respondent's answer, among other things, alleges:

"That the real and only purpose of said purchase of the plants and property by the International Harvester Company of New Jersey was to enable said company to avoid the large waste that had heretofore re-

sulted from the unbusinesslike and extravagant methods which prevailed in the sale of farm implements, tools and machinery, and particularly in the harvester trade, and it required many unnecessary canvassers, experts and selling agents, and entailed other large and useless expenditures."

I have no doubt that these matters which were cut off rendered it unnecessary, even with the increase of raw material and labor, to make this raise in price. In my view of the case, it was made because it could be made owing to lack of real and substantial competition, and I have no doubt in my own mind that had it not been for the activity of Missouri and other States' officials there would have been other raises ere this, and all in conformity with the intent had and entertained at the very incipiency of this unlawful arrangement and combination. Aggregations of large properties by bona-fide purchasers in the usual business way do not fall under the ban of the statute, but when the would-be sellers have to erect a straw man for the purchaser, the credulity of the court is strained, when we are asked to brand it as a bona-fide transaction.

The respondent in this case was a part and parcel of this gigantic and nefarious scheme. For some years it has been the mere sales agent of the International Harvester Company, the New Jersey company. It was licensed in this State to sell its own goods, but it is now selling the goods of another. As such party to an unlawful arrangement and combination it should suffer the penalties prescribed by our laws. I have indicated that we can temper justice with mercy. We have the right to absolutely oust it from the State, and in addition, to fine it. We can conditionally oust it from the State and fine it. I think a conditional ouster should go, and respondent be fined in the sum of fifty thousand dollars for its long and continued infraction of our laws.

By conditional ouster I mean that absolute ouster should go, but such judgment of ouster be suspended upon the payment of the fine aforesaid within a reasonable time to be fixed by the court.   As further conditions to the suspension of judgment of ouster, I would suggest that said respondent be required to make full and true statement to the proper State officer of the amount of its capital used by it in the transaction of its business in this State, to the end that it may be rightfully and legally taxed in this State.   That it sever its unlawful connection with the International Harvester Company of New Jersey, and present satisfactory evidence of that fact to this court within such time as may be fixed by the judgment of the court.   That, hereafter, it shall do and commit no act which will lessen or tend to lessen competition in the sale of such articles of commodity as it sells in this State.   That, hereafter, it shall do and commit no act which will unnecessarily increase or tend to increase the price of commodities of the character sold by it.   That it shall do no act in further violation of our statutes relating to pools, trusts, conspiracies, and discriminations.   Our judgment should further provide that if our decree of ouster be suspended upon the conditions mentioned, yet we shall continue control of the case to the end that if upon the motion of the Attorney-General it is made to appear that the conditions imposed have been violated, then we can make such ouster absolute.

In this opinion I have not made the facts as full as I would otherwise have done, owing to the statement of facts in the principal opinion.   These, however, express my views of the case in my own way and from my viewpoint of the record. *Woodson, J.,* concurs, *in toto; Lamm* and *Brown, JJ.;* concur in the judgment in the case as made in this opinion; *Ferriss, J.,* concurs in the judgment in the case as made herein, except as to

the fine. As to the fine he does not agree to this disposition and is opposed to a fine.

## SEPARATE OPINION.

FERRISS, J.—In this case the court is required by the statute to pronounce a judgment of condemnation upon a combination which is proved by the facts as they appear in this record to have been so far beneficial to the community. The record shows the facts to be as indicated in the opinion of the chief justice, namely, that the price of mowers and reapers has not been raised in proportion to the increased cost of materials and labor, and that otherwise incidental benefits have accrued to the consumers, and furthermore, that independent manufacturers have not suffered by reason of the combination. Yet, it must be concluded from the facts in evidence that this combination was created in order to prevent the competition which had up to that time existed between the various corporations which were finally merged in the New Jersey company, and that the combination did prevent such competition. It appears further that the competition which existed between the various members of this present combination was extreme and ruinous in character, and, if continued, might have resulted in the demoralization of the trade, to the injury of the consumers. The statute, however, is plain in its terms, and indicates very clearly that it was the purpose of the Legislature to forbid a license in this State to any foreign corporation which should prove to be a member of any combination organized to lessen competition, and this without regard to the question whether the consumer would be injuriously affected. Such drastic law was regarded, no doubt, as necessary in order to prevent evils which might flow from a combination intended to prevent competition.

It cannot be doubted that combinations may be formed to create a monopoly to the injury of consumers, and yet it must be conceded that the industrial development of the country has indicated to the minds of practical men that its successful continuation requires the aggregation of capital in order to cheapen the cost of production and fully develop the possibilities of the particular industry involved. Economically, it should be to the advantage of the consumer to have the cost of production reduced to the lowest point practicable. The problem confronting the Legislature is how to secure the benefit of a lower cost of production to the consumer without permitting combinations of capital which shall result in oppression. Of necessity, when different manufacturers in the same line of business combine their capital to create one organization where several existed before, competition between the members of such organization must cease, but such combination should benefit the consumer by allowing him to participate in the profit resulting from the lower cost of production. If such result is obtained, obviously there can be no objection to the combination itself.

The objection is against unjust exactions from the consumers in the shape of profits on fictitious values, watered stocks, and enormous commissions to promoters. In this case the promoter received more than two millions. There would be little danger to the country from combinations if they were organized and operated along the lines of plain A B C honesty.

The right of capital to employ itself in the way most advantageous to its possessor is a natural and legal right, provided it is not exercised to the injury of the people. In my judgment, the present law against pools, trusts and combinations is ineffective to protect the people against combinations of capital. The courts may dismember an organization, but they

will hardly attempt to confiscate its property; so that, after dismemberment, the ownership and control will continue substantially as before. To permit combinations to exist and at the same time secure to the people the natural and legitimate benefits of such combination is a problem not yet solved. To forbid, as the law in question does, the existence of all combinations that lessen conpetition compels a halt in the natural march of industrial development, and deprives the people of the benefits which should result from improved business methods. However, it is the duty of the court to construe and enforce the law. In obedience to this duty I concur in the opinion in this case, and in the judgment so far as it ousts the defendant from the right to do business in this State so long as it is a member of the combination. I do not, however, agree that the company should be fined, because in my judgment such penalty is not required by the statute.

## ON MOTION FOR REHEARING.

PER CURIAM.—Upon motion for rehearing, the judgment heretofore agreed upon in this cause is modified so as to reduce the fine imposed upon respondent from fifty thousand dollars to twenty-five thousand dollars, and said judgment as modified is approved and respondent's motion for rehearing denied.

## ON MOTION TO MODIFY JUDGMENT.

GRAVES, J.—I do not concur in the judgment of the majority, on respondent's motion to modify, by which judgment the fine or penalty is reduced from $50,000 to $25,000. I think the fine as originally fixed was low enough and yet a dignified sum for the case. I have always been conservative in matters of this kind. In a separate opinion in the case of

State ex inf. v. Standard Oil Co., 218 Mo. l. c. 473, I said:

"The opinion calls for but one judgment as to all respondents, that of ouster. Ouster as to the Standard Oil Company of Indiana and the Republic Oil Company is but slight punishment, for they can continue in business elsewhere. In my way of thinking, these companies should not only be ousted of their license to do business in this State, but that a substantial fine should be added. I also think that as to the Waters-Pierce Company, the judgment of ouster should not go. As. to it, a judgment of guilt should be entered, and a reasonable fine fixed. Even this would be harsh upon the minority-stock ownership in the corporation, but, as the corporation has violated the law, in our discretion we should fix a reasonable punishment. That of ouster, called for by the opinion of my brother, is more than a reasonable punishment. We have full precedents in this court in the Insurance Trust case, as in others decided by this court.

"I, therefore, concur in the opinion of my brother as to a general judgment of guilty, but think the punishment as to two of the respondents as indicated by the opinion, is insufficient, and that of the other, the Waters-Pierce Company, is excessive.

"And when I suggest that the punishment of the two is not sufficient I do not mean to say that the court should become crazed upon any subject or against any interest, but should be governed by that calm judicial judgment that has always characterized the decrees of unbiased judicial tribunals. Popular crazes have no place in the judicial opinion. With these views firmly fixed, I feel that I should insist upon a modification of the judgment indicated by the opinion to the extent herein stated. Otherwise, I concur."

From that conservatism there expressed I do not desire to depart in this case, although such conserv-

atism was liable to be shocked by the $1,000,000 fine urged by a part of the court in the Standard Oil case. In the case of State ex inf. v. Delmar Jockey Club, 200 Mo. 34, no fine was inflicted by a majority of the court, but it must be recollected that in that case an absolute ouster was fixed as a punishment. In the Standard Oil case, supra, we recognized the right of the court to fix a fine in addition to an absolute ouster; for in that case, we granted an absolute ouster as to two of the respondents, and in addition required each of them to pay a fine of $50,000. As to the third respondent, the Waters-Pierce Oil Co., we granted a conditional ouster as in this case, and fixed a fine of $50,000.

The evidence in the Standard Oil case shows that the Standard Oil Company proper had acquired a bare majority of the stock in the Waters-Pierce Oil Company and had gained control over the company by reason thereof. Mr. Pierce, the leader of the minority stock, had fought against the violation of the law. So strong was his opposition to the course of conduct which violated our laws, that he was deposed as the head of the corporation which he organized and which bore his name. This was a matter of consideration in fixing the fine in that case, because such fine had to be borne by the minority stockholders as well as by the majority stockholders. These minority stockholders had opposed the violation of law, although their corporation through the majority holding had violated the law.

We have nothing like this in the case at bar. In the case at bar not a finger was raised against the open and flagrant violation of our law. The respondent was licensed to do business in this State. It was in this State in open competition with other harvesting companies. Its stock was sold to J. P. Morgan & Company, and for a short time it continued as before in this State. Shortly, however, respondent, in utter

disregard of our laws entered into the arrangement by which competition in farm machinery became a thing of the past. From that time (1902) to this, it has openly and notoriously violated our laws by maintaining the original unlawful arrangement. For nine years it has been permitted to pilfer the pockets of the agriculturists of this State, and now it is said that a fine of $50,000 is too much! It is now said that $25,000 is sufficient. We do not feel that the matter should pass without notice, and hence this opinion.

Nor is this continuous violation of law all that should be considered. Respondent, as the Milwaukee Harvester Co., had a capital stock of $750,000. When the Morgan crowd got hold of it, this stock was raised to $3,000,000. Under the law it has paid taxes in Missouri only on a basis of the proportional part of that stock used in Missouri.

During all this time, under the evidence, it was really the agent of the International Harvester Co., the New Jersey corporation. The latter was a $120,-000,000 concern. Had this latter company undertaken to do business in this State, it would have been compelled to pay taxes on the proportionate part of $120,000,000 which was used in Missouri, instead of the proportionate part of $3,000,000. The whole thing was a cunning device to enable the big corporation to do business in Missouri by the payment of about one-fortieth of the taxes which it otherwise would have been compelled to pay. In other words, the State has lost taxes in the same proportion as the $3,000,000, the capital stock of the one concern, is to $120,000,000, the capital stock of the real party in interest. To this scheme and device the respondent in this case was a party. The scheme and device was executed by the respondent under its license in Missouri. Through the act of respondent the State has lost in taxes more than the fine fixed, to leave out of

consideration entirely the flagrant violation of our laws and the filched pocket books of purchasers of reapers, mowers and binders.

Nor do we concur in any velvet-like language used by respondent's counsel in the brief which would make this respondent and its co-conspirators appear as angels of mercy to the buying public of Missouri. Its sole purpose was to stifle competition and ruin prices. Prices were lowered in 1903, after the combine. [See record of evidence, page 413-429 and 468.] That this was to further drive out competitors, there can be no question. That it turned out as the parties thought it would, is evidenced by the fact that in that year the combine was able to take over the D. M. Osborne Co., a strong competitor, as well as other smaller concerns. Later prices were raised, and but for vigorous prosecution would no doubt have been repeatedly raised by slight and gradual advances. To all of those acts, the respondent at bar was an active party. Different were the acts of Pierce and his parties in the Standard Oil case. There we had something upon which to base the merciful action of the court, but here we have not.

To conclude, the respondent in this case has (1) openly violated our laws, whilst domiciled in this State, by entering into an arrangement to thwart competition; (2) defrauded the State of taxes to which it was entitled; (3) has participated in lowering prices and driving other competitors from the field; (4) has for nine years maintained an unlawful arrangement to decrease competition in this State contrary to our laws, and (5) has by its conduct been able to filch the purse of our agriculturists. If the original judgment of a fine of $50,000 is not exceedingly reasonable, then my conservatism has indeed been warped.

For these reasons, I dissent from the judgment of the majority in reducing the fine in this case. *Woodson, J.*, concurs in these views.