**UNITED STATES of America,**
**Plaintiff,**

v.

**CHICAGO TITLE AND TRUST COMPA-**
**NY, and Kansas City Title Insurance**
**Company, Defendants.**

**No. 63 C 2025.**

United States District Court
N. D. Illinois, E. D.

June 10, 1965.

Ralph McCareins, Antitrust Division,
Department of Justice, U. S. Govern-
ment, Chicago, Ill., for plaintiff.

Charles T. Martin, of Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendant Chicago Title & Trust Co.

Hoskins, King, Springer & McGannon, Kansas City, Mo., for defendant Kansas City Title Ins. Co.

ROBSON, District Judge.

The Government moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for a partial summary judgment striking the First Defense of defendant Chicago Title and Trust Company [1] that is predicated on the McCarran-Ferguson Act [2] (15 U.S.C. § 1011 et seq.), which it asserts renders inapplicable § 7 of the Clayton Act [3] (15 U.S.C. § 18). The Chicago Title, an Illinois corporation, licensed to do business *only* in Illinois, acquired substantially all (over 90%) of the stock of the Kansas City Title Insurance Company,[4] a Missouri corporation, in August, 1961. It is this acquisition which the Government seeks to nullify because its effect may be substantially to lessen competition, in violation of § 7, by eliminating competition and potential competition between Chicago Title and Kansas City Title, and between the latter and other companies controlled by Chicago Title. Chicago Title had previously acquired the Title Insurance Corporation of St. Louis,[5] and the Title Guaranty Company of Wisconsin.[6] The Government maintains there is no genuine issue of fact in view of the proceedings in Missouri, and the affidavits filed in support hereof and the respective state statutes.

It is the Government's contention that the McCarran Act did not, and was never intended to delegate to the States the power to legislate *extraterritorially* as to § 7 type violations. Further, even though the McCarran Act could be so construed, the States here involved have not so legislated, so that § 7 remains applicable. Nor would legislation comparable to Sherman Act provisions, which do exist in some states, be sufficient to fulfill the McCarran Act requisites. If federal legislation is to be displaced by state regulation, the latter must cover the "same ground" as the federal legislation.

1. Hereinafter called Chicago Title.

2. Hereinafter called the McCarran Act. This provides:
   "Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." (15 U.S.C. § 1011)
   "(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
   "(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided,* That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law." (15 U.S.C. § 1012)

3. Hereinafter called § 7, which provides:
   "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital * * * where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

4. Hereinafter called Kansas City Title. (It is not charged with the violation of any law.)

5. Hereinafter called St. Louis Title.

6. Hereinafter referred to as Wisconsin Title.

7. Affidavits of Earl A. Jinkinson, C. Lawrence Leggett, Jack L. Clay, Ralph H. Duggins and Joseph E. Knight, and appended exhibits.

The Government's motion for partial summary judgment challenges the legality of Chicago Title's acquisition of the stock of Kansas City Title as being violative of § 7. The defense of Chicago Title is that § 7 is rendered inapplicable to the business of insurance by the McCarran Act, and the respective state's statutes passed pursuant to that Act's authorization.

Primarily, the controversy revolves around congressional intent in the enactment of the McCarran Act, and its proviso that the Clayton Act should be applicable "to the business of insurance *to the extent* that such business is *not* regulated by State law." (Italics supplied.) If the subject of insurance is touched upon by state legislation, but there is no provision quite comparable to § 7 of the Clayton Act, is the business of insurance nevertheless deemed legislated upon within the intent of the proviso?

This cause was instituted in the Western District of Missouri, Western Division, November 9, 1962, by the United States of America against the Chicago Title and Kansas City Title, and removed here, pursuant to 28 U.S.C. § 1406(a), on *a finding that Chicago Title does not transact business in Missouri.* The instant motion for partial summary judgment was filed May 13, 1964, and was fully and ably brief and orally argued by the respective parties. The complaint alleges that the Chicago Title, an Illinois corporation with its principal office in Chicago, and Kansas City Title, a Missouri corporation, with its principal office in Kansas City, Missouri, are title insurance companies. The statistics pertaining to the title insurance business are set forth below,[8] showing the position held by Chicago Title and the interstate impact of the business.

The § 7 offense charged is the acquisition by the Chicago Title of substantially all the capital stock of Kansas City Title, which in premium income was the eighth largest title insurance company in the United States, and, in 1960, had premium income of over $3,800,000; it was licensed to write title insurance in

---

**8.** The Chicago Title is the *second* largest title insurance company *in the United States*. It, and its subsidiaries, in 1960, had a gross income of over $22,000,000, and assets of over $90,000.000. They write title insurance in some *42* states. The total amount of title insurance written increased from $858,600,000 in 1944 to $2,684,400,000 in 1952. Beginning in 1954, Chicago Title began an expansion program in Illinois, generally taking over the assets of the acquired company which was dissolved; it now has 14 offices in Illinois, and an agency relationship with some 63 independent abstract companies in Illinois, which did abstracting exclusively for it, out of a total of 67 independent abstrators in Illinois. It wrote over *95% of the total of $15,000,000 title insurance* in Illinois in 1960, 17% of which was on orders from outside Illinois. It issued, in 1959, 479 reinsurance policies with a coverage of approximately $173,000,-000 to 29 title companies located in 19 states and in the District of Columbia. The amount of its title insurance business with out-of-state customers is steadily increasing, and has directed its efforts for business on a national scale. In 1957, it began to expand out of state. Prior to 1957, it acquired an Indiana title company's outstanding stock, and the outstanding stock of the Title Insurance Corporation of St. Louis, a Missouri company; in March, 1960, it acquired all the capital stock of the Title Guaranty Company of Wisconsin, a Wisconsin company; in November, 1960, it acquired over 90% of the stock of Home Title Guaranty Company of New York, a New York company. The St. Louis Title, in 1957, had assets of over $2,000,000, and agency arrangements with some 45 independent abstract companies; it did approximately *20%* of the Missouri title business; it was licensed to issue policies in some 11 states other than Missouri, including Alabama, Arkansas, Florida, Georgia, Illinois, Indiana, Kansas, Louisiana, Mississippi, Nebraska, and Oklahoma. Wisconsin Title, in 1960, also had assets of over $2,000,000, and an annual income of over $1,000,000; it had agency relationship with some 28 independent abstract companies in Wisconsin; in 1960, Wisconsin Title wrote title insurances on which $600,000 out of $1,100,000 paid in Wisconsin were paid to it, and it had over 50% of the title business in Wisconsin when acquired by Chicago Title.

25 states [9] and the District of Columbia, and had branch offices in Arkansas, Tennessee, Mississippi, Colorado, Maryland and North Carolina. It had arrangements with over 300 local agents and was writing insurance in ten states in which the Chicago Title and its subsidiaries were writing title insurance. It maintained agency arrangements with 45 independent abstract companies in Missouri. Kansas City Title and St. Louis Title had, between them, 70% of the title insurance business in Missouri and agency arrangements with 90 of the 111 independent abstract companies in Missouri, those abstractors generally writing exclusively for them. In 1960, the income of Kansas City Title from title insurance premium on insurance written in Missouri amounted to approximately $814,000 of a total of $1,613,000. Kansas City Title had a branch office in Milwaukee, Wisconsin, in 1961, and agency arrangements with 11 independent abstract companies in Wisconsin. Kansas City Title and Wisconsin Title had, between them, agency arrangements with 40 of the total of 58 independent abstract companies in Wisconsin. Chicago Title, Kansas City Title and Wisconsin Title had over 70% of the title insurance business in Wisconsin.

The asserted effect of the acquisition of Kansas City Title by Chicago Title allegedly may be substantially to lessen competition or tend to create a monopoly in the writing of title insurance, including reinsurance, in violation of § 7 by eliminating competition and potential competition between Kansas City Title and Chicago Title, and companies it controls. Further, protecting Chicago Title's monopoly could foreclose Kansas City Title from competing therefor. Defendants have secured control over most of the title insurance business in Missouri and Wisconsin and their domination will tend toward the elimination of competition there. Finally, the concentration of control over title insurance business achieved by Chicago Title will tend to suppress competition and potential competition in all areas where it and its subsidiaries write title insurance.

In support of its motion, the Government cites the depositions of three successive Superintendents of Insurance of Missouri from 1947 to date, which stated that they knew of no Missouri statute or regulation regulating the acquisition by a foreign title insurance company of the stock of a domestic title insurance company.

The Government prays that Chicago Title's acquisition of Kansas City Title be adjudged in violation of § 7 and that it be required to dispose completely of its stock interest therein and enjoined from reacquiring same, and be enjoined, pursuant to § 15 of the Clayton Act (15 U.S.C. § 25), from ever acquiring an interest in another title insurance company without prior authority of this court.

The First Defense which the Government seeks stricken by a partial summary judgment is predicated on Chicago Title's asserted exemption from federal regulation, by virtue of the McCarran Act, in that there is "continuous and pervasive" state regulation of the title insurance business, requiring a state license to do business in each state. It asserts Kansas City Title can get a renewal of that license only if it complies with the state's regulations. Chicago Title cites the Revised Statutes of Missouri, Chs. 374, 375, 379, 381 and 416, V.A.M.S., requiring a specified paid-up capital stock and a deposit with the state; provision for reasonableness of title insurance risk rates, and the statute (§ 381.200) further states that nothing in the Act was intended to prohibit or discourage reasonable competition. Another provision prohibits transferring the business of the insurer or entering into any transaction which has the effect of merging its busi-

9. Alabama, Arkansas, Colorado, Delaware, Florida, Georgia, Indiana, Kansas, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, Nevada, North Carolina, Ohio, South Carolina, Tennessee, Texas, Utah, Virginia, Wisconsin and Wyoming.

ness in the business of another organization without approval of the Superintendent of Insurance of Missouri or violating any other law of Missouri, and among the other laws of Missouri is a comprehensive state antitrust law, which empowers the state court to issue an injunction to liquidate the insurer. Chicago Title also cites the Wisconsin statutes (Chs. 133, 200, 201, 207, 209 and 212), which regulate title insurance business. Before Chicago Title made its offer to acquire the stock of Kansas City Title, it supplied the regulatory authorities of Missouri, Wisconsin and Illinois with the relevant facts and requested them to rule on the legality of the proposed acquisition and it is stated in the First Defense that each of them ruled favorably thereon.

Chicago Title urges that Missouri and Wisconsin, in 1947, each responded to the moratorium provided by the McCarran Act by supplementing their existing antitrust laws with new legislation regulating the business of insurance which adopts the "public utility approach" of rate regulation.

The court concludes that the Government's motion for partial summary judgment should be granted, striking Chicago Title's First Defense predicated on the McCarran Act. It so concludes for these reasons:

(1) While the Congressional Record reveals the discussion of the senators which indicates their intention to have the Act applicable to combinations affecting interstate commerce, where unregulated by state law, it was their understanding that the Act *was subject to constitutional limitation of due process* theretofore stated in the prior controlling Supreme Court decisions.[10] Nor, presumably, could Congress empower states to act in contravention of those limitations.

(2) The Supreme Court decisions[11] after the McCarran Act would also indicate the inability of states to affect matters extraterritorially.

(3) The respective states here involved have not acted pursuant to the McCarran Act empowering them to legislate on insurance matters, in that they do not have a provision precisely comparable to § 7 proscribing acquisition of stock of another corporation. It is not sufficient that a state have legislated on other insurance or antitrust matters.

(4) The allegations in the pleadings, affidavits, and depositions would indicate there is no genuine issue of fact that the action of defendant would at least *tend* substantially to lessen competition violative of § 7.

The Government argues that "A State law, to meet the requirements of 'regulation' under the McCarran Act, must be enforcible by a State through the exercise of its own powers. * * * Travelers Health Association v. Federal Trade Commission, 298 F.2d 820 (C.A.8, 1962)." Also, as divestiture, which is sought in this case, is the usual, most appropriate and effective remedy for a violation of § 7 (United States v. E. I. du Pont de Nemours & Co. et al., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961)), no state regulation would be effective to displace § 7 under the McCarran Act unless the state had the power to provide for an equivalent remedy and had the means for its enforcement against Chicago Title. As Chicago Title has immunized itself from suit in all states but Illinois, no law of any other state could, under the McCarran Act, exempt the acquisition by Chicago Title of Kansas City Title from the operation of § 7. The Government also asserts

10. Allgeyer v. State of Louisiana, 165 U.S 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897); St. Louis Cotton Compress Co. v. Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297 (1922); Connecticut General Life Insurance Co. v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938).

11. Federal Trade Commission v. Travelers Health Association, 362 U.S. 293, 80 S.Ct. 717, 4 L.Ed.2d 724 (1960); Federal Trade Commission v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958).

that Sherman Act type legislation by the states is not comparable to § 7 in that the latter is aimed at incipient combinations for which there is not the requirement of certainty or actuality of injury.

It is pointed out by the Government that Illinois has no law re stock acquisitions similar to § 7. Its only act regulating title insurance is 73 Ill.Rev.Stat. 1963 §§ 478–483. (The Insurance Code is expressly made not applicable to title insurance companies.) It is contended that the Act is aimed at maintaining solvency of the title companies and not the regulation of acquisition of stock. The approval of the Director of Financial Institutions of Illinois of the stock acquisition of Kansas City Title was not sought. Similarly, Chapter 381, Mo.Rev. Stat.1959 pertains to the maintenance of reserves and the powers of the Superintendent of Insurance to assure compliance, but there is nothing pertaining to the acquisition by a foreign corporation of stock in a domestic title insurance corporation.

The Government maintains that Chicago Title's acquisition of Kansas City Title had an effect in at least ten other states—a "multistate impact"—and no one state has the power by its regulations to sanction the acquisition in any other state; and of the 12 states, only four: Arkansas, Georgia, Louisiana and Virginia, have any antitrust statutes similar to § 7 although most of them have provisions similar to the Sherman Act. Even as to the four states having some kind of statute pertaining to stock acquisition, since Chicago Title is not licensed to do business in those states, there could be no enforcement of the state statutes and therefore the McCarran Act exemption from the operation of § 7 cannot obtain (Travelers Health Association v. Federal Trade Commission, 298 F.2d 820 (8th Cir. 1962)).

In Chicago Title's motion to dismiss, filed in the transferor district, it stated that *it did not transact business in Missouri*. The basis of the Kansas City Title's motion to dismiss was that the § 7 charge is that *Chicago Title* made the acquisition of the stock, and not the Kansas City Title and therefore there is not, and can be no charge against Kansas City Title.

The affidavit of Paul W. Goodrich, president of Chicago Title, stated Chicago Title was qualified to transact business *only* in the State of Illinois, and not in the State of Missouri. The affidavit goes on to state that some of its stock was exchanged [12] for the stock of Kansas City Title and in that way acquired substantially all of its stock. Chicago Title is not qualified under the Revised Statutes of Missouri §§ 381.010 to 381.200, and has not made the deposits with the Missouri Superintendent of Insurance as required by § 381.030. An "additional" affidavit of Mr. Goodrich states that Chicago Title files an income tax return only for itself, reporting thereon the dividends it receives from Kansas City Title. Further, the assets of the latter company do not appear on Chicago Title's balance sheet, except that its stock is an asset.

To maintain its position that Missouri has legislated on the subject matter here involved, Chicago Title points out that under the Missouri law (§ 381.040 Revised Statutes of Missouri), each title insurer is required to file a very detailed annual report which includes questions as to whether the title insurer owns stock in other title insurers, and as to the ownership of the stock of the reporting title insurer. It reports its exact volume of business in each of the fifty states and its corporate relationships.

The title insurance law requires the Superintendent of Insurance to make comprehensive examinations and hold hearings to satisfy himself that each insurer is complying with the requirements of the law, and may revoke a license if he finds to the contrary.

Chicago Title cites the fact that it made full submission of the facts to the

---

**12.** At the rate of 1¼ share of Chicago Title for each share of Kansas City Title.

insurance commissioners in all 27 states in which Kansas City Title is qualified to do business. No objection was heard from any of them. The Missouri Superintendent of Insurance, after a conference, in writing informed Chicago Title that it had "no objection to the transaction." The Wisconsin Insurance Superintendent replied: "The proposed exchange is acceptable to this department."

Chicago Title lays great stress upon the Missouri decision of State of Missouri v. International Harvester Co. of America, 237 Mo. 369, 141 S.W. 672, affirmed 234 U.S. 199, 34 S.Ct. 859, 58 L.Ed. 1276 (1914), in which the State of Missouri brought *quo warranto* proceedings against a Wisconsin company, licensed to do business in Missouri, but which had been absorbed by a New Jersey corporation that was not licensed to do business in Missouri. The state court was affirmed in its ruling excluding the Wisconsin corporation from its corporate rights, under Missouri law, and that its property be forfeited or deemed confiscated or it be fined. The Government in distinguishing this decision points out that Missouri's action was against the foreign corporation licensed to do business there, and not against the foreign corporation not licensed to do business, which is the essence of § 7. And, in fact, there are no Missouri or Wisconsin statutes granting supervisory power over stock acquisitions by a non-licensed foreign corporation.

In answer, the Government points out that the Missouri court noted that inasmuch as the New Jersey company, not being a party to the suit, could not be subjected to a fine, and not being within the state, was not subject to expulsion, and could only be reached by affecting its representative in the state. Chicago Title, the Government asserts, maintains that Kansas City Title is not its agent, and it has no agent in Missouri. Similarly, under the State ex inf. Barker v. Armour Packing Co. case, 265 Mo. 121, 176 S.W. 382, the state's action was directed against companies licensed to do business *in* the state, which had transferred their stock to a foreign company not licensed in the state.

I. *The Congressional Debate.* There was much congressional debate on the passage of the McCarran Act, which would indicate that Sen. Pepper at least was cognizant of the "vexing" [13] problem this case presents, and he was adamant in his persistence to get an answer as to whether the Act meant to confer on the states the power to legislate in respect to interstate aspects of insurance antitrust agreements, which the Clayton and Sherman Acts would prohibit.

A careful reading of the complete Congressional Record pertaining to the Act would indicate that it was the intent of Congress to permit state legislation, during the three-year moratorium, on all matters, even those covered by the Clayton and Sherman Acts, with the three exceptions of coercion, boycott or intimidation. That was Sen. Ferguson's express understanding. However, Sen. O'Mahoney probably believed that state legislation would be circumscribed by the federal antitrust laws. Sen. McCarran also felt that states which enacted laws in violation of the federal antitrust laws would do so at their "own hazard," and stressed that the Act was circumscribed by prior Supreme Court decisions.

Sen. O'Mahoney stated in response to Sen. Pepper's detailed question in respect to the Act and state legislation re the federal antitrust acts, at 1480:

> "I take it that the Senator is apprehensive lest a statute passed by a State attempting to give validity to a private agreement to regulate would be recognized under this language. I think it would not, because on page 351 of the same case, Parker against Brown, I find this language from the Supreme Court:
>
> " 'True, a State does not give immunity to those who violate the

13. In re Grand Jury Investigation of the Aviation Insurance Industry, 183 F.Supp. 374 (S.D. N.Y.1960).

Sherman Act by authorizing them to violate it, or by declaring that their action is lawful (Northern Securities Co. v. United States, 193 U.S. 197, 332, 344–347 [24 S.Ct. 436, 48 L.Ed. 679]).'

"Therefore *I have no doubt in my own mind that no State, under the terms of the conference report, could give authority to violate the Sherman antitrust law.*" (Italics supplied.)

Further excerpts from the Congressional Record, which sustain the court's conclusion as to the probable congressional intent in passing the McCarran Act, are set forth in the margin.[14]

14. "* * * *There is nothing in the conference report that relieves insurance companies from the prohibition of the antitrust law,* because there has been written back into the bill language which was taken out by the House which would have exempted agreements from the prohibition of the antitrust law. Therefore any attempt by a small group of insurance companies to enter into an agreement by which they would penalize any person or any business which was attempting to do business in the insurance field in a way that was disapproved by them, would be absolutely prohibited by this provision.

"*MR. PEPPER.* * * * I am confident that the courts would hold that if they tried to legitimize a private agreement which per se violated the Sherman Act or the Clayton Act, that that would not be called regulation so as to protect them from prosecution." (P. 1480)

"*MR. FERGUSON. Under the language which is now in the bill as it appears in the conference report, if a State passes an act regulating insurance or taxing insurance, that that regulation is contrary to the Sherman Act or the Clayton Act, with three exceptions, then the State law would be the law.* * * * [I]f the states were specifically to legislate upon a particular point, and that legislation were contrary to the Sherman Act, the Clayton Act* * * *then the State law would be binding.* That is exactly what we attempted to do in the bill. It is clear what we intended to do. * * *

"*MR. PEPPER.* In other words, the Senator [Ferguson] believes in a form of rate fixing?

"*MR. FERGUSON.* Yes. * * * [W]e believe that all the wisdom is not here in Congress." (P. 1481)

"*MR. PEPPER.* * * * The Senate has heard the able Senator from Michigan say that regulation by State law may mean any degree of encroachment upon the Sherman Act and the Clayton Act which a legislature may desire to exercise. * * *

"*MR. PEPPER.* That is the reason why I am not willing to give the States the power pro tanto to repeal or invalidate either one of those acts, and that is what the language to which I am addressing myself would permit them to do. * * *

"Under the language of the conference report to which I have adverted, after the 3-year moratorium period, * * * they can curtail by State legislation the Sherman Act and the Clayton Act to any degree that they desire to do so. * * *" (Pp. 1482-3)

"*MR. O'MAHONEY.* Mr. President, *there is not a line or sentence in the proposed act as I have read it, which would delegate to any State the power to legislate in the field of interstate and foreign commerce.* State regulation must be for the State and not for the United States. The bill does not sacrifice the power of Congress to regulate in the field of interstate commerce, but wisely, it seems to me, undertakes to say in effect to the State, 'For this period take the responsibility and regulate insurance in the interest of the public.'" (P. 1483)

"*MR. PEPPER.* * * * [W]hat are we faced with here today? A carte blanche authority at this late date * * *; we are now confronted with the language of this conference report which for the first time gives the States carte blanche to legitimatize the very vices against which the Clayton Act and the Sherman Act were directed, to which acts the insurance companies at last have been made amenable by the decision of the United States Supreme Court.

"*MR. MURDOCK.* If they do something objectionable * * * then the Congress reserves the right to strike

Sen. McCarran issued a word of caution at the very beginning of the consideration stating, at 1442, of the Congressional Record:

*"It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States*

*Supreme Court* in the Southeastern Underwriters Association case. * * [Y]our committee is of the opinion that we should provide for the continued regulation * * * of insurance by the States, *subject, always, however, to the limitations set out in the controlling decisions of the United States Supreme Court.* * * *"* [15]    (Italics supplied.)

it down * * * we could make both the Clayton Act and the Sherman Act applicable in their full vigor against anything the States might do." (P. 1484)

\* \* \* \* \*

*"MR. O'MAHONEY.* * * * I do not conceive this to be a grant of power to the States to authorize by permissive legislation obviously adverse combinations which would be against the public interest.

*"MR. PEPPER.* Am I correct in saying that under the proviso * * * if a State made it an offense, under the laws of the State, to engage in combinations in restraint of trade, the Sherman Antitrust Act could not apply to combinations and restraints of trade by companies engaged in business in that State? Is not that what it means?

*"MR. O'MAHONEY.* No. * * *

*"MR. MURDOCK.* * * * Insofar as they fail to cover the same ground covered by the Sherman Act and the Clayton Act, those acts become effective again.

\* \* \* \* \*

*"MR. BARKLEY.* I should like to ask * * * whether, where States attempt to occupy the field—but do it inadequately—by going through the form of legislation so as to deprive the Clayton Act, the Sherman Act, and the other acts of their jurisdiction, it is the Senator's interpretation of the ·conference report that in a case of that kind, *where the legislature fails adequately even to deal with the field it attempts to cover, these acts still would apply?*

*"MR. McCARRAN.* That is my interpretation.

\* \* \* \* \*

*"MR. PEPPER.* I do not oppose State regulation which is not inconsistent with the operation of the Sherman Antitrust Act and the Clayton Act. On matters of taxation, general regulation, and all that sort of thing, I think the States should regulate, but *I think that now that in-*

*surance has been brought by the decision of the Supreme Court up to the bar of the Clayton Act and the Sherman Act, we should not give the insurance companies immunity* from the applicability of those acts." (P. 1444)

\* \* \* \* \*

*"MR. PEPPER.* * * * [W]ill the Senator tell the Senate if I am not correct in saying that under the conference report provision to which I referred the States can regulate the business of insurance in any way inconsistent with the ·Sherman Act and the Clayton Act.

*"MR. McCARRAN. If they do it, they do it as their own hazard ₒ . . .."*

\* \* \*

"Congress has always the power over interstate commerce. * * *

"The States cannot take the Congress out of a position where it can regulate interstate commerce." (P. 1478) (Italics supplied.)

15. He cited Connecticut General Life Insurance Company v. Johnson, 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1937), which held that a state could not because of the IVX Amendment, tax a Connecticut corporation which did reinsurance business in California, where the tax was measured by the gross premiums received. The court said, at 82, 58 S.Ct. at 439: "The grant by the state of the privilege of doing business there and its consequent authority to tax the privilege do not withdraw from the protection of the due process clause the privilege, which California does not grant, of doing business elsewhere."

The second case, St. Louis Cotton Compress Company v. State of Arkansas, 260 U.S. 346, 43 S.Ct. 125, 67 L.Ed. 297, held a state law exacting of persons insuring their property situate in the state a so-called tax of five per cent of the amounts paid by them as premiums to insurers not authorized to do business in the state, is void as applied to insurance contracted and paid

■ While it cannot be said there was a clear "meeting of the minds" of the senators on the import of the McCarran Act, it is apparent that most of the speakers intended that the states be given power to legislate during the moratorium period even as to topics covered by the Sherman, Clayton, and Federal Trade Commission Acts, with the exception of the three specified matters: duress, boycott, or intimidation, at least so far as they constitutionally could do so.

■ The specification of certain exemptions from the application of those Acts negates the conclusion that other exemptions were intended.[16] Furthermore, it would seem the purpose of the McCarran Act would be futile and purposeless if it were not meant to empower the states to legislate to some extent in the fields of the Sherman and Clayton Acts.

However, it seems reasonably clear that the Federal Acts were to obtain in those cases where the states did not take advantage of the privilege granted them to legislate on those subjects. The very manner of phrasing, affirmatively, that the Federal Acts *"shall be applicable"* to the extent that the "business of insurance * * * is *not* regulated by State law," would indicate a positive intention of Congress to have those acts continue in control.

There is an interesting law review note on the instant problem in 46 Minn. L.Rev. 1088, "Applications of Federal Antitrust Laws to the Insurance Industry" wherein this conclusion was reached, at 1110:

"The McCarran Act provides two routes by which the insurance industry may be subject to federal antitrust regulation. The first requires a showing that the states have not regulated within the meaning of section 2(b). Since *'regulation'* requires more than mere *'legislation,'* state laws pre-empt federal antitrust laws only where it is demonstrated that the state laws also provide for enforcement. *Whether the question is one of jurisdictional competence to regulate, as in the case of the unauthorized foreign insurer, or whether the question is one of sufficient statutory coverage of the field, as in the case of Clayton Act violations, the requirement of effective state regulation determines federal jurisdiction."* (Italics supplied.)

It is also said in the article, at 1093–1097:

"The proviso to section 2(b) limits the application of federal antitrust laws to the business of insurance *'to the extent that such business is not regulated by State law.*

for outside the state by a foreign corporation doing local business. The court said, at 349, 43 S.Ct. at 125: "It is true that the State may regulate the activities of foreign corporations within the State but *it cannot regulate or interfere with what they do outside."* (Italics supplied.)

The third case is Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832 (1897), where it was held a Louisiana statute was in violation of the Constitution of the United States which provided that any firm which in any manner whatever does an act in that state to effect, for himself or for another, insurance on property then in that state, in any marine insurance company which has not complied in all respects with the laws of the state, shall be subject to a fine when applied to a contract of insurance made in the State of New

York, with an insurance company of that state, where the premiums were paid, and where the losses were to be paid, is a violation of the Constitution of the United States. At 591, 17 S.Ct. at 432, the court said: "Such a statute as this in question is not due process of law, because it prohibits an act which under the federal constitution the defendants had a right to perform. This does not interfere in any way with the acknowledged right of the state to enact such legislation in the legitimate exercise of its police or other powers as to it may seem proper. *In the exercise of such right, however, care must be taken not to infringe upon those other rights of the citizen which are protected by the federal constitution."*

16. *Expressio unius est exclusio alterius.*

* * * Since the Act gives no indication of what constitutes state regulation, the Act's underlying policies must be examined to ascertain its meaning.

"The McCarran Act was designed to continue state regulation of the insurance business. Congress determined that the states were better equipped than the federal government to regulate the insurance industry because of their proximity to the local insurance industry's problems and because of their experience and expertness in regulating the industry. Nonetheless, Congress did seek to place some limitation on the preeminent position given state regulation. By providing that federal antitrust laws were still applicable to the extent that the states failed to regulate, Congress apparently sought to balance its protection of state regulation with the requirement that there be *complete* regulation (whether state or federal). Maintenance of a balance between these interests would seem to require that federal antitrust laws should be pre-empted only if a state's insurance laws (1) cover the subject matter, (2) regulate the subject matter to the extent state power permits, and (3) provide for effective administration of the laws applying to the subject matter."

* * * * *

"On the other hand, the Supreme Court has recognized that some types of state legislation may fail to constitute state regulation because the subject matter may not be open to effective administration."

* * * * *

"The Supreme Court's approach in FTC v. Travelers Health Ass'n seems to be the better view. The Court indicated that section 2(b) pre-empts the federal law only if the subject matter is within the state's jurisdictional power and if the state insurance law provides for effective administration. The insurance industry constitutes a substantial segment of the national economy; obviously, it alone should not be allowed to operate outside of both state and federal antitrust laws."

* * * * *

"Even if a state's laws are effectively administered, there may be some areas which the state *cannot* 'regulate' and which, therefore, may not be exempt from the federal antitrust laws. Because there are *effective limits* on the state's power, the state may lack the power to assert its jurisdiction over 'foreign' insurance companies and thus fall short of the McCarran Act's requirement of 'regulation.' This jurisdictional disability, therefore, may determine whether the state can effectively regulate an insurer and, thus, whether federal antitrust laws apply." (Italics supplied.)

■ II. *The Supreme Court Decisions after the McCarran Act.* The United States Supreme Court has clearly indicated that the McCarran Act did not intend to confer upon the individual states the right to legislate extraterritorially so far as the Federal Trade Commission Act [17] was concerned and held that no state regulation could operate "to displace this federal law" except by the state in which the practice had its "impact." The McCarran Act was not intended to permit a single state to take "from the residents of every other State the protection of the * * * Act." (Federal Trade Commission v. Travelers Health Association, 362 U.S. 293, 80 S. Ct. 717 (1960))

That case involved a Nebraska company selling health insurance, licensed only in Nebraska and Virginia, and transacting business with residents of *every* state. Nebraska had a statute proscribing unfair methods of competition by

---

17. Comparably situated in the McCarran Act phraseology.

residents of Nebraska "in any other state." The Federal Trade Commission had entered a cease and desist order against the company's practices, which order the Court of Appeals set aside, and in turn was vacated by the Supreme Court. The Supreme Court said, 362 U.S. at 296, 80 S.Ct. at 719:

> "The court [of Appeals] concluded that '[w]ith every activity of the [respondent], * * * subject to the supervision and control of the Director of Insurance of Nebraska, we think that the [respondent's] practices in the solicitation of insurance by mail in Nebraska or elsewhere reasonably and realistically cannot be held to be unregulated by State law.' The court accordingly decided that the Commission was 'without authority to regulate the practices of the [respondent] in soliciting insurance.' "

The Supreme Court quoted from its prior opinion in Federal Trade Commission v. National Casualty Co., 357 U.S. 560, at 564, 78 S.Ct. at 1262, saying (362 U.S. 293, at 297, 80 S.Ct. 717, at 720):

> "The Court expressed no view as to 'the intent of Congress with regard to *interstate* insurance practices *which the States cannot for constitutional reasons regulate effectively.* * * *' " (Italics supplied.)

The court continued, at 297–299, at 720 of 80 S.Ct.:

> " * * * Rather, we are asked to hold that The McCarran-Ferguson Act operates to oust the Commission of jurisdiction by reason of a single State's attempted regulation of its domiciliary's extraterritorial activities. But *we cannot believe that this kind of law of a single State takes from the residents of every other State the protection of the Federal Trade Commission Act.* In our opinion the state regulation which Congress provided should operate to displace this federal law means regulation by the State in which the decep-

tion is practiced and *has its impact."* (Italics supplied.)

Again, the Supreme Court said, at 300–302, at 721 of 80 S.Ct.:

> " * * * Yet, from that somewhat limited debate, as well as the earlier debate in both Houses as to the effect of the Sherman and Clayton Acts, it is clear that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated. *There was no indication of any thought that a State could regulate activities carried on beyond its own borders.*

> "Thus the report on the original House bill stated: 'It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the Southeastern Underwriters Association case.'

> * * *

> " * * * The three Senate conferees * * * repeatedly emphasized that the provision did not authorize state regulation of extraterritorial activities. * * * Typical is the following statement by Senator O'Mahoney: 'When the moratorium period passes, the Sherman Act, *the Clayton Act, and the Federal Trade Commission Act come to life again in the field of interstate commerce, and in the field of interstate regulation. Nothing in the proposed law would authorize a State to try to regulate for other States, or authorize any private group or association to regulate in the field of interstate commerce.'* 91 Cong.Rec. 1483.

> "Not only this specific legislative history, but also a basic motivating policy behind the legislative movement that culminated in the en-

actment of the McCarran-Ferguson Act serve to *confirm the conclusion that when Congress provided that the Federal Trade Commission Act would be displaced* to the extent that the insurance business was 'regulated' by state law, *it referred only to regulation by the State where the business activities have their operative force.* One of the major arguments advanced by proponents of leaving regulation to the States was that the States were in close proximity to the people affected by the insurance business and, therefore, were in a better position to regulate that business than the Federal Government. * * * Such a purpose would hardly be served by delegating to any one State sole legislative and administrative control of the practices of an insurance business affecting the residents of every other State in the Union. * * *

" * * * [*T*]*he impediments, contingencies, and doubts which constitutional limitations might create as to Nebraska's power to regulate any given aspect of extraterritorial activity serve only to confirm the reading we have given to § 2(b) of the Act.*" (Italics supplied.)

After remand from the Supreme Court, it was held in Travelers Health Association v. Federal Trade Commission, 298 F.2d 820 (8th Cir.1962), that the Federal Trade Commission had jurisdiction to regulate advertising sent by a Nebraska insurer into other states, where 48 states did not possess ample means to regulate the advertising on the basis of their own law, even though the insurer's business was subject to regulation by Nebraska, and another state in which it was licensed to solicit and write insurance. The court said, at 823 of 298 F.2d:

" * * * On the opinions of the Supreme Court in the present case and in the National Casualty case, however, it is, we think, apparent that, *under the McCarran-Ferguson Act, the situation cannot be regarded as 'regulated by State law', except in terms of each state's sovereignty and of its having on this basis legislative provision possessing the character of regulation and capable of being enforced through the exercise of its own powers.*

"To the extent, therefore, that a state, for control of the acts of Travelers Health Association to be effected as to it, must depend on any provisions, instrumentalities or *processes of another state,* we believe that its situation *cannot, within the McCarran-Ferguson Act, be held to be 'regulated by State law'. The state must itself be legally able to do, through its own provisions, instrumentalities and processes, everything that is necessary to the effecting of control as to its situation.*" (Italics supplied.)

The court further said, at 825 of 298 F.2d:

"To summarize—our holding here rests on the basis that, for forty-eight of the states to be able to exercise ultimate legal compulsion against Travelers Health Association in attempted regulation, they must resort to the statutes, instrumentalities and processes of another state (Nebraska) for effectuation of their orders, decrees and judgments; they must convert those decrees and judgments into decrees and judgments of such other state; and they further must invoke that state's auxiliary processes for effectuation of such decrees and judgments, in the status of products of the courts of that state and not of their own. Thus, we do not believe it is possible to say that as to these states the Association's advertising is 'regulated by State law', within the concept which it seems to us that term implies, *of being able to control by local power and means.*" (Italics supplied.)

In State Board of Insurance et al. v. Todd Shipyards Corp., 370 U.S. 451, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962), a New York corporation did business and owned

real and personal property in Texas. It sued to recover taxes levied and collected by Texas on insurance covering its property in Texas. All the transactions pertaining to the insurance took place *outside* of Texas. The insurers were domiciled in London and were not licensed in Texas and did no business and had no office or agents in Texas. The insurance was bought and issued in New York and the premiums thereon and claims thereunder were payable in New York. It was held that in the light of the history and provisions of the McCarran Act the Texas tax on these wholly out-of-state transactions was invalid. The Supreme Court quoted from Senator McCarran's statement, at 456 of 370 U.S., at 1383 of 82 S.Ct.:

"* * * '[W]e give to the States no more powers than those they previously had, and we take none from them.' * * *

"So, while Congress provided * * * that the insurance business 'shall be subject to the laws of the several States which relate to the regulation or taxation of such business,' it indicated without ambiguity that such state 'regulation or taxation' should be kept within the limits set by * * * [three Supreme Court decisions].

"The power of Congress to grant protection to interstate commerce against state regulation or taxation * * * or to withhold it * * * is so complete that its ideas of policy should prevail."

The case of Federal Trade Commission v. National Casualty Co., 357 U.S. 560, 78 S.Ct. 1260 (1958), recognized the limitations of the McCarran Act, stating, at 564 of 357 U.S., at 1262 of 78 S.Ct.:

"* * * *Whatever may have been the intent of Congress with regard to interstate insurance practices which the States cannot for constitutional reasons regulate effectively, that intent is irrelevant in the cases before us.*" (Italics supplied.)

In United States v. Philadelphia National Bank et al., 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), § 7 of the Clayton Act was held applicable to bank mergers despite the Bank Merger Act of 1960. The court stated, inter alia, at 348, 83 S.Ct. at 1733:

"* * * It is settled law that '[*i*]*mmunity from the antitrust laws is not lightly implied.*' * * * This canon of construction, which reflects the felt indispensable role of antitrust policy in the maintenance of a free economy, is controlling here. For there is no indication in the legislative history to the 1950 amendment of § 7 that Congress wished to confer a special dispensation upon the banking industry * * *." (Italics supplied.)

Quite recently, in a District Court case: Maryland Casualty Company v. American General Insurance Company, 232 F.Supp. 620 (1964), Finding of Fact No. 2, stated (¶71,188 CCH 1964 Trade Cases):

"*No regulation of the proposed acquisition of control of Maryland or its agencies under Texas or Maryland statutes can be adequate or effective because of territorial limitations of Texas and Maryland regulation.* Texas and Maryland statutes do not provide for adequate or effective regulation of the proposed acquisition of control of Maryland or its agencies and there is no such regulation thereunder as precludes this suit under the antitrust laws." (Italics supplied.)

In Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L. Ed.2d 510 (1962), the Government brought suit to enjoin consummation of a merger of two corporations on the ground that its effect might be substantially to lessen competition or to tend to create a monopoly in the production, distribution and sale of shoes, in violation of § 7. The Supreme Court affirmed the District Court's finding that the merger would increase concentration in the

shoe industry, eliminate one of the corporations as a substantial competitor in the retail field, and establish a manufacturer-retailer relationship which would deprive all but the top firms in the industry of a fair opportunity to compete, and that, therefore, it probably would result in a further substantial lessening of competition and an increased tendency toward monopoly.

The court said, at 316 et seq., 82 S.Ct. at 1519:

"First, there is no doubt that Congress did wish to 'plug the loophole' and to include within the coverage of the Act the acquisition of assets no less than the acquisition of stock.

"Second, by the deletion of the 'acquiring-acquired' language in the original text, it hoped to make plain that § 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country.

"Third, it is apparent that a keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. * * *

\*       \*       \*       \*       \*

"Fifth, at the same time that it sought to create an effective tool for preventing all mergers having demonstrable anticompetitive effects, Congress recognized the stimulation to competition that might flow from particular mergers."

In Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), it was held that despite the Civil Aeronautics Act and the Federal Aviation Act that, at 305 and 307, at 482 of 83 S.Ct.:

*"We, therefore, refuse to hold that there are no antitrust violations left to the Department of Justice to enforce.* (Italics supplied.)

\*       \*       \*       \*       \*

"The legislative history was reviewed in [citing case] * * *, the Court concluding that 'unfair competition was that practice which destroys competition and establishes monopoly.' * * * 'All three statutes [the Sherman and Clayton Acts and § 5] seek to protect the public from abuses arising in the course of competitive interstate and foreign trade.' "

Earlier, and with a somewhat less federally slanted view of the McCarran Act, the Supreme Court said in Prudential Insurance Company v. Benjamin, 328 U.S. 408, at 429, 66 S.Ct. 1142, at 1155, 90 L.Ed. 1342 (1946):

"Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects."

III. *Effect of State Legislation.* The background for consideration of the effect of state legislation is found in the statement of Sen. McCarran in the Congressional Record, at 1443:

" * * * [T]he States may, if they see fit to do so, enact legislation for the purpose of regulation. If they do enact such legislation, to the extent that they regulate they will have taken the business of insurance in the respective States out from under the Sherman Antitrust

Act, the Clayton Act. * * * If * * * the States do not enact legislation for regulatory purposes, then on January 1, 1948, the Sherman Act, the Clayton Act * * * will become immediately applicable."

\* \* \* \* \*

"It [the Supreme Court] put it [insurance] squarely under the Sherman Act, the Clayton Act. * * The pending bill is for the purpose * * * that the business of insurance shall not be interfered with by any Federal power under * * * the Clayton Act. * * * So during the period of moratorium the various States themselves may take steps to regulate the business of insurance."

\* \* \* \* \*

"[I]f in the meantime the States themselves had regulated the business of insurance, the * * * Clayton Act * * * would not become effective."

Senator Pepper on that point stated, at 1478:

"[N]owhere in the * * * bill is there any authority to the States to prevent the applicability of the Sherman Act and the Clayton Act after 3 years to the business of insurance in the states."

Chicago Title stresses the fact that both Missouri and Wisconsin have the "public utility approach" in respect to insurance rates, which assures reasonable rates to the public and a reasonable margin of profit for the company, thereby achieving the same objective which the antitrust acts achieve by fostering competition. It says that the utility approach is even more advantageous in that it does not result in wasteful insolvencies. Statutory provisions of that nature constitute "regulation" within the McCarran Act constituting a pre-emption by the states of the field, and precluding the applicability of the Clayton Act. (California League of Ind. Ins. Pro. v. Aetna Cas. & S. Co., 175 F.Supp. 857 (S.D.Cal.1959); Miley v. John Hancock Mutual Life Insurance Co., 148 F.Supp. 299 (D.Mass.1957)).

The Court believes that this position beclouds the issue. Concededly the states in those instances have "regulated" insurance and such regulation is within the McCarran Act and therefore without the Federal ambit. The instant case is one where the states have not so acted, comparably to § 7, even though in one respect their "public utility approach" may accomplish the same end as antitrust regulation. The Federal Government has decided competition is healthy economics and that intent is not necessarily satisfied because one of its ends is achieved by another means.

That view is also pertinent to defendant's great reliance on the early Missouri decisions,[18] which reveal a power in that state to censure an insurance company to the point of extinction, which power would be applicable to Kansas City Title, and therefore is tantamount to regulating the foreign owner, Chicago Title, which is not found in the jurisdiction. The exercise of that drastic club on the resident company would benefit the policyholders in the dissolved company very little, as compared to stopping the contemplated action in its tracks before injury is done.

The statute of Missouri imposes some regulations on title insurance companies, deposit of securities, reports, etc. Conceding, as Chicago Title argues, that the Missouri statute, § 416.010 prohibiting "agreements * * * in restraint of trade" and § 416.040 prohibiting "arrangements * * * which tend to lessen * * * competition," encompass title insurance companies, nevertheless, they do not cover Chicago Title's ab-

18. State ex inf. Major v. International Harvester Co. of America, 237 Mo. 369, 141 S.W. 672; State ex rel. Barker v. Assurance Co. of America, 251 Mo. 278, 158 S.W. 640, 46 L.R.A.,N.S., 955.

sentee acts, nor could they be enforced against Chicago Title. The affidavits of successive Missouri Superintendents of Insurance state they know of no Missouri statute regulating the Chicago Title transaction here involved.[19]

Illinois, while having a law regulating title insurance,[20] has no act comparable to § 7. It is expressly not within the insurance code.[21] The Illinois antitrust statute has been construed not to apply to combinations with parties outside the state,[22] or to the business of insurance.[23]

There is an outline of the respective statutes of other states involved in this acquisition in the supporting brief. A reading of those provisions would indicate their inapplicability to the instant transaction.

■ The court does not view the "reasonable rate" statute of Missouri[24] or Wisconsin,[25] though it be "indisputably regulation of the very heart of the business of title insurance," to be of the same nature as § 7's provision, although the "forces of competition set prices." It is one factor therein. With or without competition state regulation of prices is effective.

■ IV. *Effect of Acquisition as Lessening Competition.* There would seem to be little question that the effect of Chicago Title's acquisition of Kansas City Title, in view of the principles applicable to the facts herein alleged, "may be substantially to lessen competition, or to *tend* to create a monopoly" in a "section of the country." Chicago Title's stature in the nation and in Illinois, its relative volume of business, its territorial coverage, as heretofore detailed, its past company acquiring program, all indicate that the acquisition here assailed would fall within the ban of the Clayton Act.

It is asserted by the Government that in ten out of the eleven states here involved, Chicago Title is accused of controlling ten per cent or more of the total title insurance. In Missouri and Wisconsin, the acquisition resulted in control of over sixty-five per cent of the title insurance business, eighteen per cent in Louisiana, thirty-nine per cent in Kansas and sixty-six per cent in Arkansas.

In discussing the statutory test as to whether the effect of a merger " 'may be substantially to lessen competition' 'in any line of commerce in any section of the country,' " the court in United States v. Philadelphia National Bank, 374 U.S. 321, at 357, 83 S.Ct. 1715, at 1738, 10 L.Ed.2d 915, said:

"The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate."

It further said, at 362, 83 S.Ct. at 1741:

"It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.' "

---

19. Deposition of Jack L. Clay. There was also no objection thereto. The Illinois official stated no request for the Chicago Title's action was made to him.

20. Ill.Rev.Stat.1963, Ch. 73 §§ 478–487. There is also a reference therein to the Trust Company Act: Ill.Rev.Stat.1963, Ch. 32 §§ 298–299.

21. Ill.Rev.Stat.1963, Ch. 73 § 1063.

22. Chicago Wall Paper Mills v. General Paper Co., 147 F. 491 (7th Cir. 1906); The People ex rel. v. Butler Street Foundry and Iron Co., 201 Ill. 236, 66 N.E. 349 (1903).

23. Opinions of Attorney General, 1898, p. 228.

24. § 381.100.

25. Wis.Stat.Ann. Ch. 204.39.

It continued, at 363, 83 S.Ct. at 1741:

"This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects. Specifically, we think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."

In United States v. El Paso Natural Gas Co. et al., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), the Federal Government filed suit under § 7 charging that the acquisition by a natural gas company, then the sole out-of-state supplier to California, of the stock and assets of another gas company, one of the two major interstate pipelines serving the trans-Rocky Mountain states, which had made some efforts to enter the California market "may be substantially to lessen competition." The court held that the words "may be substantially to lessen competition" in § 7 manifests Congress' concern with probabilities and not with either certainties or ephemeral possibilities.

The force of the Sherman Act on the insurance business was dwelt upon in United States v. South-Eastern Underwriters Assn., 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which holding of applicability called forth the Mc-Carran Act.

The motion of the Government for a partial summary judgment is granted, and the Government is directed to submit an appropriate draft order within ten days.

